Sylvia Patricia LAND, Plaintiff,

v.

MIDWEST OFFICE TECHNOLOGY, INC., d/b/a Metro–Plex Information Systems, David Egly, and Kenneth Illig, Defendants.

No. 96–4115–SAC.

United States District Court, D. Kansas.

July 7, 2000.

ships upon the death of a partner. *See e.g.,* K.S.A. § 59–1001, et seq.

See also 5 F.Supp.2d 936.

Cheryl D. Myers, Michael B. Myers, Myers & Myers, Topeka, KS, for Plaintiff.

Julia Riggle McKee, C. Brooks Wood, Cheryl Bloethe Linder, Morrison & Hecker L.L.P., Kansas City, MO, for Defendants.

MEMORANDUM AND ORDER

CROW, Senior District Judge.

This employment discrimination action comes before the court on defendants' Motion for Summary Judgment (Dk. 120). This case arises out of following claims: (1) sexual harassment and retaliation in violation of the Kansas Act Against Discrimination, K.S.A. 44–1009 ("KAAD"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"); (2) employment discrimination on the basis of sex in violation of the KAAD and Title VII; (3) retaliation in violation of the KAAD and Title VII; (4) outrage; (5) negligent infliction of mental distress; (6) retaliation for filing a workers' compensation claim; (7) constructive

discharge; and (8) breach of contract. The court has considered the briefs of counsel, the uncontroverted facts and applicable law, and is now prepared to rule.

## I. FACTS

The following facts are either uncontroverted or, if controverted, construed in a light most favorable to plaintiff as the nonmoving party. Immaterial facts and factual averments not properly supported by the record are omitted. Plaintiff Sylvia Patricia Land began working at the predecessor company to Metro–Plex Information Systems ("Metro–Plex") in Topeka, Kansas, on or about Sept. 9, 1985. (Dk. 133, Land depo. p. 4). Metro–Plex is in the business of selling and servicing copy machines (Dk.133, Exh. 1) and is wholly owned by Kenneth Illig ("Illig"). Land had a close working relationship with Illig, who actively managed Metro–Plex until David Egly ("Egly") took over as General Manager in June or July of 1993. (Dk. 122, Illig depo., p. 54). Soon after Egly became general manager, the working environment began to deteriorate, in Land's view, as a result of Egly's offensive conduct. Land resigned her employment with Metro–Plex on July 21, 1995. (Dk. 122, Land depo, p. 269). These and other relevant material facts are set forth in more detail throughout the court's discussion.

## II. SUMMARY JUDGMENT STANDARD

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, 89 L.Ed.2d 538; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)).

The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination

of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

Summary judgments " 'should seldom be used in employment discrimination cases.'" *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999) (*quoting Smith v. St. Louis University*, 109 F.3d 1261, 1264 (8th Cir. 1997)). Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.1994); *see Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994) ("[T]he summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds*, *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852(1995).

## III. ANALYSIS

*Title VII—Application of Statutory Time Limit*

■ Section 2000e–5(e) of 42 U.S.C. provides that a discrimination charge must be filed within 300 days after the alleged unlawful conduct occurs. This filing is a prerequisite to a civil suit under Title VII. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Defendants contend that many of plaintiff's allegations are time-barred because they occurred more than 300 days before plaintiff filed her EEOC and KAAD charges on June 16, 1995.[1]

■ Plaintiff concedes that many of the alleged acts of harassment occurred outside the time limit imposed by Title VII. She also alleges, however, many incidents which clearly occurred within the 300 day time frame. Plaintiff contends that these incidents, when viewed together with those incidents that occurred outside the time limitation, represent a continuing pattern of discrimination. *See Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1543 (10th Cir.1987); *Martin*, 3 F.3d at 1415(*quoting Furr*, 824 F.2d at 1543). The court agrees.

Plaintiff claims that throughout her employment with Metro–Plex, Egly repeatedly made sexually explicit remarks and gestures, which she found to be offensive. Assuming for purposes of the statute of limitations issue only, that Egly's conduct constitutes sexual harassment, plaintiff's allegations would suffice to establish a continuing pattern of discrimination by Egly. Although it is undisputed that Land was aware of the alleged harassment long before she filed her administrative complaint, the court finds that, under the facts of this case, her failure to file an charge earlier does not preclude her from relying on the continuing violation doctrine to overcome the statutory time limitation. *See Martin*, 3 F.3d at 1415 (applying continuing violation theory despite the fact that sexual harassment, including an incident of rape, continued for a long time before plaintiff

**1.** The court notes that Land filed her administrative charge the same day as did the plaintiff in a companion case involving the same defendants as in this case. *White v. Midwest Office Technology, Inc.*, 5 F.Supp.2d 936 (D.Kan.1998). In *White*, J. Saffels granted defendants' motion for summary judgment on claims similar in many respects to those brought in the present case.

filed with the EEOC). Therefore, the court will consider evidence of incidents that occurred prior to the 300–day statutory time limitation.

*Sexual Harassment—Hostile Work Environment*

■ Plaintiff can establish actionable sexual harassment under Title VII if she demonstrates she was subjected to a hostile work environment so severe or pervasive that it constructively altered the terms or conditions of her employment.[2] *See Ellerth,* 118 S.Ct. at 2265; *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In order to survive summary judgment, plaintiff must produce sufficient evidence to allow a rational jury to find that (1) the alleged harassing conduct was severe or pervasive enough to create an objectively hostile or abusive work environment, and (2) plaintiff subjectively perceived the environment to be abusive.[3] *See Harris,* 510 U.S. at 21, 114 S.Ct. 367; 29 C.F.R. § 1604.11(a); *Smith v. Norwest Financial Acceptance, Inc.,* 129 F.3d 1408, 1412 (10th Cir.1997).

■ For a hostile environment claim to survive a summary judgment motion, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

*Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1261(10th Cir.), *cert. denied,* 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999)(*quoting Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998)); *see Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ Title VII does not proscribe conduct "merely tinged with offensive sexual connotations." *Oncale v. Sundowner Off-*

*shore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Consequently, in the context of a hostile environment claim, courts must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks and citation omitted). Moreover, "[i]f the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination." *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996) (internal quotation marks and citation omitted). Thus although a workplace is unpleasant at times, where the indignities suffered are episodic and ambiguous in nature, they are not sufficiently severe or pervasive to alter the conditions of employment. *See Penry,* 155 F.3d at 1260–63.

■ However, even acts that do not appear to be motivated by gender animus are to be considered in the court's assessment of the work environment. *Penry,* 155 F.3d at 1262–63 (stating that a district court should examine the totality of circumstances when ruling on summary judgment in a hostile environment case); *Curtis v. Oklahoma City Public Schools Bd. of Educ.,* 147 F.3d 1200, 1214 (10th Cir.1998).

■ The Tenth Circuit recently clarified that the court must view the evidence in context, not simply in its segmented parts, when evaluating hostile work environment claims.

[T]he existence of sexual harassment must be determined 'in light of the record as a whole,' and the trier of fact must examine the totality of the circumstances, including " 'the context in which the alleged incidents occurred.' " (footnote omitted).

---

2. Plaintiff has made no claim of quid pro quo discrimination.

3. Metro–Plex does not challenge in this motion plaintiff's assertion that she subjectively found her work environment to be hostile.

*Penry,* 155 F.3d at 1262, *quoting Meritor,* 477 U.S. at 69, 106 S.Ct. 2399.

 The reason for this requirement is explained in *O'Shea v. Yellow Technology Services, Inc.,* 185 F.3d 1093 (10th Cir.1999), where the court reversed summary judgment because factual issues existed as to whether co-employees' gender-motivated conduct so poisoned the entire body of conduct toward employee that all allegedly harassing conduct against her could be viewed as product of gender hostility:

> Such a thorough examination of the record is required because "the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation." (citation omitted). Under this interpretation, because conduct which is not gender-based may form a part of the context or environment in which the discriminatory conduct is alleged to have occurred, such conduct may be relevant to, and should be considered in, evaluating a hostile work environment claim. *In Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987), for example, we held that "[e]vidence of a general work atmosphere ... —as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." Thus, even if some of the alleged conduct was not " 'explicitly sexual in nature,' " *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1265 (1997) (citation omitted), if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn. *See Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (explaining that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support

any reasonable inference for the non-movant").

185 F.3d at 1097.

 Thus "facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea,* 185 F.3d at 1097. *See Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994). "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. Harassment alleged to be because of sex need not be explicitly sexual in nature." *O'Shea,* 185 F.3d at 1097, quoting with approval *Carter v. Chrysler Corp.,* 173 F.3d 693, 701 (8th Cir.1999) (citations omitted).

 Accordingly, the court will consider not only the allegations of conduct which are overtly sexual in nature, but also those which are not, in determining from the totality of the circumstances whether the plaintiff's work environment was objectively hostile because of sex.

> The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective. (footnote omitted). *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367 (1993). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (citation omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances ... includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295. Finally, we note that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is " 'quintessentially a question of fact.' " *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir.1994) (citation omitted).

*O'Shea*, 185 F.3d at 1097–98.

*Evidentiary Issues*

 Defendants allege that the statements of certain witnesses for the plaintiff regarding sexual harassment and other issues are incompetent because they are presented by means of transcription from a court reporter, instead of in signed affidavits. This court has previously held that a statement sworn and transcribed by a certified shorthand reporter is at least as reliable as an affidavit, for purposes of providing evidence to be considered in deciding a summary judgment motion. *Duffee v. Murray Ohio Manufacturing Co.*, 160 F.R.D. 602, 604 (D.Kan.1995). There, this court denied contentions identical to those made by defendants here, in words equally applicable to this case:

> The forms of evidence mentioned in Rule 56—affidavits, pleadings, depositions, answers to interrogatories and admissions on file—are not the exclusive ways for presenting evidence in a Rule 56 proceeding. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 at 40 (1983). "The cases indicate that there are a variety of materials not expressly mentioned in Rule 56 that a federal court may consider on a summary judgment motion." 10A Federal Practice and Procedure § 2724 at 73. Cases have recognized statements, like Chris Duffee's, to be proper Rule 56(c) material.
>
> The Ninth Circuit in *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323–24 (9th Cir.1991), *cert. denied*, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992), held the trial court properly considered an unsigned transcript of a witness's statement given under oath. For precedent,

the Ninth Circuit looked to two of its own decisions. In *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 967 (9th Cir.1981), the court held that depositions where the defendants were denied the opportunity to cross-examine the deponents were still the substantial equivalent of a Rule 56(c) affidavit. In *In re Sunset Bay Associates*, 944 F.2d 1503, 1510 (9th Cir.1991), it was held that a witness's sworn statement given in a question and answer format, without crossexamination or the witness's signature was still admissible under Rule 56(c). "Because there is no reason to believe that the sworn answers to questions are less reliable than an affidavit, to the extent that the content of the deposition testimony is otherwise admissible, that testimony should be admissible on summary judgment." *Id.* at 1510.

*Duffee*, 160 F.R.D. at 604.

 The statements complained of here are written witness statements given under oath, administered by a registered merit reporter or court reporter, and transcribed by the same. (See Dk. 133, statements of Glauberman, Cox, Covitz and Kelly). For the reasons set forth in *Duffee*, the court finds those statements to be competent evidence and will consider them to the same extent as if they were affidavits.

 The bulk of defendants' responses to the alleged facts challenge plaintiff's credibility, and urge the court to discount plaintiff's affidavit in support of her summary judgment motion because it conflicts with her deposition testimony given earlier. The court is well aware that in assessing a conflict under these circumstances, the court should disregard a contrary affidavit only if it constitutes an attempt to create a sham fact issue. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1463 (10th Cir.1996). The rationale underlying such decisions is that the utility of summary judgment as a procedure for screening out sham fact issues

would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony. *Franks*, 796 F.2d at 1237.

The court finds it unnecessary to examine the factors established in *Franks*. Plaintiff's affidavit does not contradict her earlier deposition testimony, but rather supplements it by adding details that are consistent with her earlier version of events, and about which she was not specifically questioned at the time. Under these circumstances, no conflict of the *Franks* variety exists, and the court is not convinced that plaintiff's affidavit should be disregarded in considering the propriety of summary judgment. Defendants are, of course, free to question plaintiff about and to compare the two sworn statements at trial, in an attempt to persuade the jury that one should be given more credence than another, but the court's ruling on the issue of sexual harassment in this motion would be the same even if the plaintiff's affidavit were totally discounted.

 Metro–Plex had no written policy against sexual harassment while Land worked there. (Dk. 122, Illig depo., p. 117–119). The evidence and reasonable inferences viewed in favor of plaintiff show that Egly engaged in the following conduct while in plaintiff's presence: told an employee that plaintiff and he, who were leaving on business together, were going to party the rest of the day; (Dk. 133, Land depo., p. 82–83); stood with his hands on his genitals while wiggling his torso (*Id.*, p. 296); looked up and down plaintiff's torso repeatedly on numerous occasions (*Id.*, p. 297–298); told plaintiff, while looking up and down her torso, that she would have to spend the night and share time with him and Illig (*Id.*, p. 117, 298); told plaintiff, while staring up and down her torso, that he would use lady's underwear to do dishes after the office Christmas party (*Id.*, p. 143–145); accused plaintiff, in front

of other employees, of having slept with Illig (Dk. 133, Land depo. p. 286); said to plaintiff, after eating a large breast of turkey for a work-related dinner which she also attended, that he and Illig had had a "Sylvia dinner" (Dk. 133, Land depo. p. 113, 115, 158); told plaintiff by telephone on or about October 24, 1994, that a male employee said Egly was f——ing another female employee on his lunch hour, and that a different female employee said that Egly had the female sitting on his desk, showing Egly her "beaver," and that Egly then said "It's only a lunch hour if you are eating something" (Dk. 122, Land depo., p. 279; Dk 122, Exh. 82); threated to fire plaintiff if she reported workplace events to Illig, and accused her of sleeping with Illig while standing over her, leaning against her desk (Dk. 133, Land depo., p. 98–99); threatened to fire her if she did not go to the Kansas City office and sell full time (*Id.*, p. 73); on April 19, 1995, locked plaintiff in his office, threatened to terminate her, masturbated[4] twice during that three and one-half hour session, yelled at her, and shook his fist in her face (*Id.*, p. 221–225); sent plaintiff a memo signed "love, David (*Id.*, p. 106–107); called plaintiff an "order-taking monkey" (Dk. 122, Bates p. 499); and referred to plaintiff as Syllie or Sylly (Dk.133, Exh. 14)."

Other non-hearsay evidence from Metro–Plex employees shows that when Egly was not around plaintiff, he repeatedly referred to her "the Topeka bitch," (Dk. 133, Harmon statement, p. 5); "the hot sex queen," "the sex goddess," "the hot Topeka witch," "that sexy young thing, that Topeka witch," (Dk. 133, Cox statement, p. 15–16); "the Topeka witch," and "the witch with Medusa hair." (Dk. 133, Covitz statement, p. 9–10.) According to male co-employee, Eglsy treated women as "second class citizens," by his behavior and statements, (Id., p. 12), and engaged in what they believed to be sexual harassment, and had been trained not to do at

---

4. Plaintiff does not merely conclude that such act occurred but sets forth in her deposition sufficient facts, which will not be repeated herein, which if believed would justify the conclusion that such act occurred.

other places of employment. (Dk. 133, Covitz statement, p. 12; Harmon statement, p. 13).

Given the fact that credibility determinations are inappropriate at this stage of the case, plaintiff has presented genuine issues of fact as to whether she was the object of harassment because of her gender, *Penry,* 155 F.3d at 1261. When the conduct which is merely harassing is considered with the obviously sex and gender-motivated conduct, including the incident of April 19, 1995, plaintiff has additionally presented material issues of fact regarding the severity and pervasiveness of the conduct. Accordingly, defendants' motion for summary judgment on the hostile work environment claims will be denied.

### Discrimination in Compensation

Plaintiff alleges a violation of Title VII in that she performed the same job duties as similarly situated males, but did not receive commensurate salary, wages, commissions, and bonuses. (Dk.153, p. 7). Defendants seek summary judgment because: 1)plaintiff was not a salesperson, thus was not similarly situated to those she uses as comparators; and, 2) the group of salespersons who allegedly received better compensation than plaintiff included women, thus any discrimination was not gender-based.

In order to survive a motion for summary judgment with regard to her claim of disparate treatment under Title VII and the KAAD, plaintiff must meet the initial burden of establishing the prima facie case articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). She must show: (1) she is a member of a protected group, (2) she suffered an adverse employment action, and (3) similarly situated employees were treated differently. *See Trujillo v. University of Colo. Health Sciences Ctr.,* 157 F.3d 1211, 1215 (10th Cir.1998) (modifying the usual *McDonnell Douglas*

prima facie case to fit the context of a disparate treatment claim).

The evidence is unequivocal regarding the nature of plaintiff's job. Although plaintiff sold some equipment (Dk. 133, Land depo., p. 71–73; Dk. 133, Glauberman statement, p. 14–15; Dk. 133, Harmon statement, p. 9–10), testimony clearly indicates that plaintiff was not a full-time salesperson, (Dk. 133, Land depo., p. 71–73), and that her responsibilities included acting as dispatcher and office coordinator in Topeka. (Dk. 122, Illig depo., p. 94). Plaintiff admits that she did not attend sales meetings and did not believe that documents addressed to "Sales executives" in Topeka included her. (Dk. 122, Land depo., p. 500). The nature of plaintiff's job is not similar enough to that of full time salespersons to use them as comparators for purposes of determining compensation. Plaintiff has not met her burden to show that she held a job substantially similar to that of higher paid males. *See Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1362 (10th Cir.1997)(applying "substantial similarity" test to Title VII gender discrimination claim, rather than "equal work" test used in Equal Pay Act cases).

But even if plaintiff had sustained her burden to show that her position and functions were substantially similar to those of full-time salespersons, she has not shown that any difference in pay[5] was based on her gender. In fact, plaintiff has not rebutted defendants' evidence that the sales persons who were compensated on the basis of salary plus commission, as plaintiff desired to be, included a woman. (Dk. 133, Covitz statement, p. 6). The evidence shows a legitimate basis for the difference in pay, and none of the evidence presented by plaintiff reveals a desire on the part of Metro–Plex to intentionally pay her less because of her gender. Plaintiff has failed to raise a material question of fact that

---

**5.** Although neither party has shown evidence of the disparity in the amount of compensation between plaintiff and full-time salespersons, it is uncontested that plaintiff did not receive commissions for the equipment she sold, but that at least some full-time salespersons did.

any disparity in compensation was based upon gender. Accordingly, summary judgment is warranted on this claim.

*Retaliation*

 KAAD, Title VII, and the ADA prohibit an employer from discharging an employee who opposes any acts of discrimination prohibited by the applicable statute. See K.S.A. 44–1009(a)(4); 42 U.S.C. § 2000e–3(a); 42 U.S.C. § 12203(a) & (b). A prima facie case of retaliation under these statutes is made by showing "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir.1997). Upon such a showing, the burden shifts to the defendant to produce a legitimate, non-retaliatory reason for its employment decision. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997). The burden then shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the employer's decision, but instead, that the decision was made for retaliatory reasons. This burden may be met either by direct evidence of the employer's retaliatory motive or by evidence that the proffered reason is pretextual. *See id.* at 1396.

 It is uncontested that plaintiff filed her EEOC/KHRC charge of sex discrimination and disability discrimination on or about June 16, 1995, (Dk.133, Exh. 9) and that this activity constitutes protected conduct for purposes of a retaliation claim. *See McCue v. State of Kansas*, 165 F.3d 784, 789 (10th Cir.1999). Plaintiff additionally contends that in October of 1993, she made internal complaints to management of sexual harassment, (Dk. 133, Land depo., p. 113–116,) and that these complaints also constitute protected activity. The court agrees that informal complaints to superiors or the use of the employer's internal grievance procedures constitutes protected activity under Title VII. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000); *Robbins v. Jefferson County Sch. Dist. R–1*, 186 F.3d 1253, 1258 (10th Cir.1999). Although defendants dispute that plaintiff ever complained internally of sexual harassment, a material issue of fact exists on this issue.

 Defendants allege that even if plaintiff engaged in protected conduct, she suffered no adverse action. "In recognition of the remedial nature of Title VII, the law in this circuit liberally defines adverse employment action. *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996)." *Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir.1998). Contrary to defendants' assertions, the Tenth Circuit has declined to require that an adverse employment action be "material" in order to be actionable. *Jeffries*, 147 F.3d at 1232.

Rather, the Tenth Circuit takes a case-by-case approach to determining whether a given employment action is "adverse." *See, e.g., Corneveaux v. Cuna Mut. Ins. Group*, 76 F.3d 1498, 1507 (10th Cir.1996) (showing of adverse employment action where employee required to "go through several hoops" in order to obtain severance benefits); *Berry*, 74 F.3d at 986–87 (showing of adverse employment action where employer reported plaintiff of suspected crime thereby creating risk of humiliation and damage to reputation); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993)(sufficient adverse employment action where plaintiff was reassigned against her wishes). Although the Tenth Circuit liberally defines an "adverse employment action," it does not extend to " 'a mere inconvenience or an alteration of job responsibilities.' " *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir.1998). See *Heno v. Sprint/United Management Company*, 208 F.3d 847 (10th Cir.2000) (affirming summary judgment where plaintiff worked in the same job, for the same pay, with the same benefits, but defendant had moved her desk, monitored her calls, been "chilly" towards

her, and suggested that she might do better in a different department).

Plaintiff testified that the adverse action consisted of the following: on July 1994, defendants hired another salesperson who said he was replacing Land as branch manager (Dk. 133, Land depo. p. 176, 177); on May 11, 1994, Egly threatened to fire Land if she did not transfer to the Kansas City office and sell full-time (Id., p. 73); Egly threatened to fire Land if she told owner Illig of workplace events, (Id., p. 88–89, 98–99); on April 19, 1995, Egly told Land she would sit at his desk for training until she could do the job the way he wanted it done (Id., p. 221–225); and, in March 1995, plaintiff's rate of pay was changed from salaried to hourly. (Id., p. 447–448). Plaintiff further alleges retaliation in that defendants breached her employment contract; (Dk. 133, p. 36), and Egly "threatened a libel and slander suit" against her. (Id., See Dk. 133, Exh. 10).

After carefully reviewing the record, the court finds the conduct complained of insufficient to constitute adverse action, as is required for a Title VII or ADA retaliation claim. After the new employee made the statement about replacing Land, Land continued to do substantially the same job as before. Land testified that her job duties both increased, (Dk. 133, Land depo. p. 176, 177) and decreased thereafter. (Dk.133, Exh. 9, p. 8). Although plaintiff's rate of pay (and perhaps others') was changed from salaried to hourly, the amount of her pay stayed the same (Id., p. 447–448).

Egly's threatened slander and libel suit is nothing more than a letter noting and accepting plaintiff's resignation, stating details such as her receipt of her final paycheck, reminding her of the "no-compete" clause in the contract of employment, and stating: "You might wish to consider refraining from any conduct which constitutes libel or slander of the company and its personnel which would mandate legal action." (Dk.133, Exh. 10). The court finds this letter to be a typical closure letter, which neither threatens a defamation action, nor constitutes adverse action.

Similarly, unrealized threats of future termination or training, such as those made by Egly, fall short of the level of actionable retaliation. See Cole v. Ruidoso Mun. Schools, 43 F.3d 1373, 1381 (10th Cir.1994) (no showing of adverse employment action where no evidence that threat to evaluate teacher more often than peers was carried out); Fortner v. State of Kansas, 934 F.Supp. 1252, 1268 (D.Kan.1996), aff'd 122 F.3d 40 (10th Cir.1997) (no showing of adverse employment action where supervisors' manner toward plaintiff was attributable to increase of predictable tension in office after a discrimination charge is filed). Plaintiff suffered no change in the amount of compensation she was receiving, and no change in the fundamental terms and conditions of her employment. Plaintiff's complaints show nothing but a mere inconvenience or an alteration of her job responsibilities, which is insufficient to show adverse action.

Furthermore, to develop a prima facie case of retaliation, a plaintiff must show not only protected activity and adverse action, but also a causal relationship between the two. "The requisite causal connection may be shown by producing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" McGarry, 175 F.3d at 1201 (quoting Burrus v. United Telephone Co. of Kan. Inc., 683 F.2d 339, 343 (10th Cir.1982)). "In other words, [the plaintiff] must present some evidence that her employer undertook the adverse employment action for the purpose of retaliation." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1320–1321 (10th Cir.1999).

"Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." Conner v. Schnuck Markets, Inc., 121 F.3d

1390, 1395 (10th Cir.1997). Events remote in time from a complaint undercut an inference of retaliatory motive. *See Burrus,* 683 F.2d at 343. Here, plaintiff's complaint to Illig was in December of 1993. Her EEOC/KHRC complaint was made on June 16, 1995. None of the acts alleged to constitute adverse action occurred within a close enough proximity of time to either of these protected acts to raise an inference of causation. No additional evidence has been offered to show causation. Accordingly, summary judgment on this claim is warranted for this additional reason as well.

 The same analysis applies to plaintiff's claim of retaliation for having filed a workers' compensation claim,[6] see Chaparro v. IBP, Inc., 104 F.3d 367, 1996 WL 733771, at *5 n. 3 (10th Cir.1996), and the same result is reached. The record reveals that plaintiff's cervical strain occurred, and her workers compensation claim was filed, in 1992, (Dk.122, Exh. 49). Egly was not even hired until June or July of 1993, (Dk. 121, p. 2, no. 4, uncontroverted by plaintiff), and most, if not all, of the allegedly retaliatory acts did not occur until 1994 or 1995. (See citations to record above). No temporal proximity exists. Plaintiff has failed to show adverse action, and has failed to present evidence of a causal connection between plaintiff's pursuit of her workers compensation rights and any adverse employment action. The evidence simply does not justify any inference that any adverse actions were taken against plaintiff because of her pursuit of those rights.

*ADA Claim*

 The ADA prohibits employers from discriminating against individuals on the basis of disability. *See* 42 U.S.C. § 12112(a). As with Title VII claims, ADA claims must be filed in states such as

Kansas within 300 days after the occurrence of the unlawful discriminatory practice. 42 U.S.C. § 2000e–5(e)(1); *See E.E.O.C. v. Commercial Office Products Co.,* 486 U.S. 107, 110–12, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Aronson v. Gressly,* 961 F.2d 907, 911 (10th Cir.1992). Defendants allege that plaintiff has failed to meet this requirement.

 Plaintiff's administrative charge of disability discrimination was filed on June 16, 1995. Plaintiff alleges that defendants' failure to accommodate her began on or about December 8, 1993, and continued until her last day of work, on July 21, 1995. Plaintiff further testified that she requested specific accommodations on numerous occasions from Wayne Jeter, the company comptroller. (Dk. 133, Land Depo. p. 122; Dk. 133, Exh. 9, p. 8). Although Jeter denies this, the court cannot weigh credibility in resolving this motion. Under the continuing violation theory, see *Martin,* 3 F.3d 1410, the court will consider plaintiff's claims to be timely.

 To prevail on her ADA discrimination claim, plaintiff must establish that: (1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) the employer discriminated against her because of her disability. *See Taylor v. Pepsi–Cola Co.,* 196 F.3d 1106, 1109 (10th Cir.1999). Plaintiff bears the burden of raising a genuine issue of material fact on each element of her prima facie case. *Doyal v. Oklahoma Heart, Inc.,* 213 F.3d 492 (10th Cir. 2000); *See Taylor,* 196 F.3d at 1109.

 Disability is a term of art under the ADA. The statute defines disability as: (A) a physical or mental impairment that substantially limits one or more of the

---

**6.** See *Ortega v. IBP, Inc.,* 255 Kan. 513, 525, 874 P.2d 1188 (1994). Although state law retaliation claims in Kansas add the element of employer knowledge to those required under Title VII, See *Kastner v. Blue Cross and Blue Shield of Kansas, Inc.,* 21 Kan.App.2d 16, 894 P.2d 909 (1995) Syl, ¶ 10, the court finds it unnecessary to address this element specifically, given the plaintiff's failure to raise a genuine issue of material fact on the common elements addressed above.

major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff alleges that her cervical strain which gave rise to her workers compensation claim constitutes a disability, apparently under subsection A.

"[C]onsideration of subsection A of the definition proceeds in three steps." *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). First, the court must determine whether the plaintiff has an impairment. *See id.* Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. *See id.* Third, the court asks whether the impairment substantially limited the major life activity. *See id.*

The ADA does not define the term "major life activity." That term has been construed to mean a "basic activity that the average person in the general population can perform with little or no difficulty." *See Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999). Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working. *See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.,* 168 F.3d 1228, 1231–32 (10th Cir. 1999). "The Supreme Court in *Bragdon* made clear that the court, in making determinations of law and formulating jury instructions, is to analyze only the major life activity asserted by the plaintiff." Id.

Plaintiff asserts that her cervical strain limited her ability to work. Assuming arguendo that Plaintiff's cervical strain constitutes a physical impairment, the question turns on whether plaintiff's back injury "substantially limits" her ability to work. The term "substantially limits" is defined by 29 C.F.R. § 1630.2(j). That section lists three factors to consider in determining whether an individual is substantially limited in a major life activi-

ty: "The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

Even when viewed in the light most favorable to plaintiff, the evidence does not support a finding that her cervical strain was sufficiently severe as to substantially limit her ability to work at the time she contends that the defendants should have provided reasonable accommodation. Plaintiff suffered her injury in October of 1992, (Dk.122, Exh. 49), received medical treatment for that injury, (*id.*) was released by the physicians for that injury before May 2, 1994, (*id.*) and continued to work at the same job both before and after her injury. (Dk. 133, Land depo., p. 35–36, 176–177). Furthermore, plaintiff makes no showing that she was unable to perform a wide range of jobs in various classes, or a class of jobs, as is required under the ADA. *See* 29 C.F.R. § 1630.2(j)(3) (when the major life activity is working, a substantial limitation entails an inability to perform either a class of jobs or a broad range of jobs in various classes).

The court finds that plaintiff did not have a disability, within the meaning of that term in the ADA, when employed at Metro–Plex. *See McKiver v. General Elec. Co.,* 11 F.Supp.2d 755 (M.D.N.C. 1997); *Dohrer v. Metz Baking Co.,* 1999 WL 60140 (N.D.Ill.1999)(both finding cervical and/or lumbar strains not disabilities). No recovery under the ADA is thus possible.

*Outrage*

Defendants seek summary judgment on plaintiff's intentional infliction of emotional distress claim. To establish a claim of intentional infliction of emotional distress, commonly referred to as the tort of outrage, a plaintiff must demonstrate four elements: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must

be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman,* 267 Kan. 245, 257, 978 P.2d 922 (1999).

 For plaintiff's claim to survive summary judgment, the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it. *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society." *Id.* The threshold requirements for outrage causes of action are "necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolator Courier Corp.,* 790 F.Supp. 1069, 1073 (D.Kan.1992) (citing *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1261–62 (D.Kan.1984)).

 Intentional infliction of emotional distress "is not a favored cause of action under Kansas law." *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan.1994) (*quoting E.E.O.C. v. General Motors Corp.,* 713 F.Supp. 1394, 1396–97 (D.Kan.1989)). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Id.* (*quoting Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990)). The existence of a hostile work environment sufficient to support a Title VII claim does not necessarily require a finding of outrageous conduct. *See, e.g., Varley v. Superior Chevrolet Automotive Co.,* 1997 WL 161942, *16 (D.Kan.1997); *Anspach v.*

*Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1507 (D.Kan.1993), *aff'd,* 51 F.3d 285, 1995 WL 133385 (10th Cir.1995).

The few cases in which courts have permitted outrage claims in the employment context have involved repeated physical threats and racially or sexually abusive language. *See, e.g., Laughinghouse,* 754 F.Supp. at 836 (overruling motion for judgment notwithstanding the verdict where defendant created a "long-standing pattern of abusive behavior" over a period of eighteen months consisting of sexual propositions, criticism of work performance, calling plaintiff "stupid," attacking her personal life, touching her offensively, throwing things, and angrily intimidating her); *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982)(denying summary judgment where racial invective and threats of violence by employer to employee were made over several days); *Oliphant v. Perkins,* 1995 WL 7729 (D.Kan. 1995) (permitting punitive damages against employer after jury verdict, where manager routinely lost his temper, directed his anger at plaintiff, called her profane and sex-based names, cursed and screamed very loudly plaintiff while in their small office, so as to be heard in other areas of the restaurant).

 The incidents upon which plaintiff bases her claim are those same incidents upon which she bases her sexual harassment claims, which are discussed above. Given the assertions made by plaintiff, it is a close call whether the defendants' conduct is sufficient to constitute outrage. See *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan.1994) (D.Kan. 1994) (rude, abrasive and unprofessional behavior of an employee, including making a culinary effigy of a penis, not outrageous); *Byle v. Anacomp, Inc.,* 854 F.Supp. 738, 747–48 (D.Kan.1994) (no claim of outrage where plaintiff felt threatened by her supervisor, was called on occasion a "bitch" by her supervisor, and supervisor monitored her comings and goings and evaluated her performance

harshly). However, given the assertion of the incident of April 19, 1995, the court believes that reasonable fact finders might differ as to whether Egly's conduct was so extreme and outrageous as to permit recovery, and will permit a jury to decide the issue.

■ The plaintiff thus has the burden to show that plaintiff's distress was sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it. *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981). This threshold is met where a plaintiff seeks mental health counseling, and contemplates suicide, *Price v. Automotive Controls Corp.,* 1992 WL 190680 (D.Kan. 1992), although neither is required. In certain cases, the overall nature of the harassment that is allegedly directed at plaintiff can be so shocking and outrageous as to give rise to an inference of severe emotional distress. *See Taiwo v. Vu,* 249 Kan. 585, 596, 822 P.2d 1024 (1991) ("In our opinion, the enormity of the outrage created by Ms. Vu's conduct is sufficient to satisfy the second threshold requirement of severe and extreme mental distress."); *Bernard v. Doskocil Companies, Inc.,* 861 F.Supp. 1006, 1015 (D.Kan.1994); *Compare Anspach v. Sheet Metal Workers' Intern. Ass'n Local No. 2,* 51 F.3d 285 (10th Cir.1995) (plaintiff's case of "nerves" and resulting hives did not establish emotional distress severe and extreme enough for liability).

■ Here, plaintiff has presented evidence of her psychological evaluation showing that as a result of Egly's "sexual, off color remarks and lewd acts," plaintiff was disturbed, experienced trouble sleeping, had nightmares of losing her job, became depressed, had crying episodes, experienced symptoms of anxiety including nausea, decreased sleep, shakes, and shortness of breath, had increased irritability, frustration, and fearfulness, grew concerned for her own safety, suffered a decreased appetite and increased fatigue, and had experienced suicidal thoughts. This evidence, whether or not coupled with an inference of mental distress flowing from the degree of Egly's outrageous acts, is sufficient for a reasonable jury to find that plaintiff's mental distress was so severe and extreme as to result in defendants' liability for intentional infliction of emotional distress.

Accordingly, the court will deny defendants' motion for summary judgment on this claim.

*Negligent Infliction of Emotional Distress*

Defendants next argue that plaintiff's claim for negligent infliction of emotional distress must be dismissed because plaintiff fails to show the requisite physical injury. The court agrees.

■ It is well settled under Kansas law that "there can be no recovery for emotional distress caused by the negligence of another unless accompanied by or resulting in physical injury." *Humes v. Clinton,* 246 Kan. 590, 598, 792 P.2d 1032(1990) (citing cases); *See, e.g., Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1196 (D.Kan.1995). Generalized physical symptoms of emotional distress, such as headaches and insomnia, are insufficient to support an emotional distress claim. *Anderson v. Scheffler,* 242 Kan. 857, 752 P.2d 667 (1988). Moreover, a plaintiff seeking to recover for negligent infliction of emotional distress must show "that the physical injuries complained of were the direct and proximate result of the emotional distress caused by the [defendant's] alleged negligent conduct." *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 277, 662 P.2d 1214 (1983).

■ In this case, plaintiff has presented no evidence that defendants' conduct was accompanied by or resulted in physical injury, or that any such injury was the proximate result of the emotional distress caused by the defendants' negligent actions. Those symptoms found to support plaintiff's mental distress, for purposes of her outrage claim, are insufficient to constitute the requisite physical injury to support her negligent infliction claim. Ac-

cordingly, plaintiff's claim for negligent infliction of emotional distress fails as a matter of law.

*Constructive Discharge*

Defendants contend that plaintiff was not constructively discharged, but voluntarily quit her employment.

 In order to make out a constructive discharge claim, [the plaintiff] must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable. *See Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343–44 (10th Cir. 1986). The plaintiff's subjective view of the employment environment and the employer's subjective intent with regard to discharging her are both irrelevant. *See id.* If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged. *See Yearous v. Niobrara County Memorial Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997). "Essentially, a plaintiff must show that she had 'no other choice but to quit.'" *Id.* (*quoting Woodward*, 977 F.2d at 1401).

 *Jeffries*, 147 F.3d at 1233. "A finding of constructive discharge must not be based only on the discriminatory act; there must also be aggravating factors that make staying on the job intolerable." *James v. Sears Roebuck*, 21 F.3d 989, 992 (10th Cir.1994).

 Plaintiff bases her constructive discharge claim on the same facts that support her sexual harassment claim. Although the court has found a genuine issue of fact regarding whether plaintiff was subjected to a hostile work environment or the tort of outrage during her employment, the court finds that plaintiff has not raised a triable issue of fact on her constructive discharge claim. Plaintiff has

presented no evidence that she had no option other than to quit on July 21, 1995. Plaintiff's termination occurred over three months after the April 19, 1995 incident, and plaintiff has provided no evidence of defendants' conduct after that incident which, whether viewed in isolation, or in conjunction with earlier events, would compel a reasonable employee to resign. Further, plaintiff admits that she had begun applying and interviewing for jobs with other employers before she resigned her employment at Metro–Plex, but does not recall when. (Dk. 122, Land depo., p. 269–277). The record fails to show any aggravating factors that made staying on the job intolerable, and raises an inference that plaintiff resigned of her own free will. Under these circumstances, summary judgment on plaintiff's constructive discharge claim is warranted.

*Breach of Contract*

 Defendants also seek summary judgment on plaintiff's claim that defendants breached her contract of employment. Plaintiff alleges that defendants breached their express agreement regarding her compensation, as set forth in a written employment agreement, and that Illig breached his oral promise to employ her until her retirement, or in the event Metro–Plex were sold, at a subsequent business. (Dk.133, p. 38–39).[7] Illig testified that he may have said that plaintiff would have a job as long as he owned Metro–Plex, but did not recall saying so. (Dk. 133, Illig depo., p. 101). Defendants claim that plaintiff was an employee-at-will, but that even if there were a contract to keep plaintiff employed for a definite period of time, no breach of that contract occurred because plaintiff voluntarily resigned.

7. The court rejects defendants' characterization of this claim as an implied contract, given the express oral promise allegedly made by Illig. Compare *Morriss v. Coleman Co. Inc.*, 241 Kan. 501, 513, 738 P.2d 841 (1987); *Allegri v. Providence–St. Margaret Health Cen-* *ter*, 9 Kan.App.2d 659, 664, 684 P.2d 1031 (1984) (implied in fact contract arises when parties become contractually obligated by nonverbal conduct and agreement arises from mutual intent to contract).

The provision which plaintiff alleges was breached in the written agreement provides: "The consideration given to the Employee for this Agreement shall be his/her salary, wages, commissions or other remuneration received by him/her in the normal course of his/her employment." (Dk.133, Exh. 1, p. 3). This language merely states that the compensation received by the employee is the sole consideration for the employment agreement, and can in no way be reasonably construed to create a promise to pay plaintiff commissions. No breach of this language has been shown.

The written agreement additionally states that the term of employment is "at will only and may be summarily· terminated at any time by either party, with or without cause ..." (Dk.133, Exh. 1, p. 1). Here, no policy or program of the employer, either express or implied, is alleged to restrict the employer's right of termination at will. Instead, plaintiff bases her claim of a contractual right to continued employment solely on oral assurances Illig that plaintiff would be employed at Metro–Plex until her retirement, or in the event Metro–Plex were sold, at a subsequent business.

▆▆▆ Although the question of the existence of a contract is usually a question of fact, where the alleged promises are nothing more than vague assurances, the issue can be decided as a matter of law. *Dupree v. United Parcel Serv., Inc.,* 956 F.2d 219, 222 (10th Cir.1992) (*citing Williams v. Maremont Corp.,* 875 F.2d 1476, 1481 (10th Cir.1989)).

"Courts 'must distinguish between carefully developed employer representations upon which an employee may justifiably rely, and general platitudes, vague assurances, praise, and indefinite promises of permanent continued employment.'" *Hayes,* 905 P.2d at 783 (*quoting Hinson,* 742 P.2d at 560 (Kauger, J., concurring in part and dissenting in part)). Therefore, "unless an employee at-will can prove substantive restrictions on the employer's power to discharge, the ·employment must be considered to be terminable at will." *Id.* (*citing Blanton v. Housing Auth.,* 794 P.2d 412, 415 (Okla.1990)).

*Vice v. Conoco, Inc.,* 150 F.3d 1286 (10th Cir.1998).

▆▆▆ In light of this written agreement, signed by both parties, and after a thorough review of the record, the court finds that no genuine question of fact exists regarding whether Illig's statements, which plaintiff allegedly relied on, amount to an enforceable contract or promise. The statements, at most, constitute vague assurances about the future. *See Vasey v. Martin Marietta Corp.,* 29 F.3d 1460, 1465 (10th Cir.1994); *Hawley v. Dresser Industries, Inc.,* 737 F.Supp. 445 (S.D.Ohio 1990) (promise of employment until retirement or lifetime employment would not alter at-will status). They do not manifest an intent to contract and any reliance upon them as creating a contract or promise is unwarranted. *See id.* at 1466; *Orback,* 97 F.3d at 433; *see also Dobbs v. Chevron U.S.A., Inc.,* 39 F.3d 1064, 1069 (10th Cir. 1994) (vague oral statements by employer did not amount to contract for continued employment). The statements allegedly made by Illig are not sufficiently definite to constitute an express agreement to limit the employer's right to fire the employee at will, as established in the written agreement. *See Bullington,* 186 F.3d at 1321–1322.

▆▆▆ Summary judgment on this claim is warranted for an independent reason as well. Plaintiff asserts that her continued work performance constituted the necessary consideration to support the alleged "employment until retirement" contract. However, "the consideration for an employment-at-will contract is the bargained-for exchange of the services of the employee for pay. Further consideration is required to support a promise of indefinite continued employment." *Humphreys v. Bellaire Corporation,* 764 F.Supp. 489, 493 (S.D.Ohio, 1991).

■■■ It is a universally recognized rule of law that:

a contract of permanent employment which is not supported by any consideration other that the obligation of services to be performed on the one hand and wages to be paid on the other is a contract for an indefinite period and, as such, is terminable at the will of either party.

*Kunz v. Colnon*, 54 F.Supp. 673, 675 (D.Kan.1944). Plaintiff has presented no evidence that she provided any consideration additional to the services incident to her employment-at-will. Accordingly, even if Illig's statements were sufficiently definite to be enforceable, the alleged contract fails for lack of consideration. Plaintiff's employment remained an indefinite general hiring terminable at will by either party, as stated in the written employment contract.

■■■ Further, even if each of the elements of a contract were established, no breach of that contract has been shown. (See above, discussing constructive discharge theory). Additionally, any "employment until retirement" contract alleged would likely be unenforceable for non-compliance with the Kansas statute of frauds, K.S.A. 33–106. That statute requires any contract that cannot possibly be performed within one year from the date of its making to be in writing. If plaintiff is not an employee at will, but is instead employed for the specific duration of time until her retirement, which is more than a year from Illig's statement, then that agreement must be in writing to be enforced. Because plaintiff admits the statement is oral, and it involves performance that is of a fixed duration which cannot be accomplished within a year, it is unenforceable. A contract unenforceable under the statute of frauds affords no basis for an action to recover damages occasioned by its breach. *Evans v. Lynch*, 200 Kan. 331, 436 P.2d 867 (1968).

*Alter Ego Theory*

The individual defendants allege they are entitled to summary judgment on plaintiff's claims that they are individually liable under Title VII, ADA, and the KAAD. Plaintiff seeks to pierce the corporate veil and hold Egly and Illig liable as alter egos of Metro–Plex.[8]

The Tenth Circuit has not addressed the narrow issue whether a supervisor can be deemed an "employer" subject to Title VII liability in his individual capacity under an alter ego theory. It has held, in cases not raising alter ego arguments, that individuals are not proper party defendants to Title VII suits. *Haynes v. Williams*, 88 F.3d 898 (10th Cir.1996) (applying general rule of no individual liability under Title VII). The Tenth Circuit has recognized, however, that there may be instances when corporate form can be disregarded in deciding who may be liable as an "employer" under Title VII. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir.1993) (noting, but not applying, alter ego theory in finding parent corporation not liable for employment discrimination by subsidiary corporation.)

Cases in the district of Kansas that have examined this issue are split. See e.g., *Johnson v. Van Tuyl*, No. 92–2103–KHV, 1994 WL 373884 (D.Kan. June 9, 1994)(dismissing individual defendant from employment discrimination suit, where the plaintiff sought to proceed against an individual as the alter ego of the corporate defendants, noting that individual capacity suits were barred by law, citing *Sauers* ); *Roberts v. Air Capitol Plating, Inc.*, 1997 WL 446266, at *8–*9 (D.Kan. July 22, 1997)(permitting plaintiff to amend her complaint to allege individual liability under alter ego theory in employment discrimination case, and finding that *Haynes* does not stand for the proposition that an individual can never be held liable as an

---

**8.** This argument is distinct from the claim that the corporation is liable because the individual is its alter ego, by virtue of the employee's managerial role in hiring, firing, and supervising employees. See Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993).

employer for discrimination under Title VII.)

Under the alter-ego doctrine, a supervisor may be held liable under Title VII as an "employer" when "the supervisor's role is more than that of a mere supervisor but is actually identical to that of the employer." *Curcio v. Chinn Enterprises, Inc.*, 887 F.Supp. 190, 193–194 (N.D.Ill.1995) (holding that individual, as president, controlling shareholder, and head of management with supervisory authority, can be held liable as an "employer" under Title VII as the "alter ego" of the corporation, applying factors such as the supervisor's control over the employing entity, his decision-making power, and whether the supervisor left any avenue for employees to object to his conduct). The "alter ego" theory has been successfully advanced in other Title VII cases as well. See e.g., *Santiago v. Lloyd*, 33 F.Supp.2d 99, 103–04 (D.Puerto Rico 1998) (finding Lloyd subject to individual liability where he was a 50% stockholder and president of the corporation, was "always physically there 'supervising' the business, and his role was more than that of a mere supervisor but was actually identical to that of the employer);" *Janopoulos v. Harvey L. Walner & Assocs., Ltd.*, 835 F.Supp. 459 (N.D.Ill.1993) (where individual was the sole partner of the law firm and thus the only person with his amount of authority and responsibility, he was the law firm and was individually liable, per alter ego theory, as an "employer" for the purposes of liability under Title VII).

Where similar claims were made in an ADA case, the Eastern District of New York stated that:

[t]o plead a claim for individual liability under the alter ego doctrine, two essential elements must be plead: (1) that the person exercises such dominion and control with respect to the transaction attacked that the corporation had no separate will of its own; and (2) that the domination and control was used to commit a ... wrong against the Plaintiff which proximately caused the Plaintiff's injuries.

*Lane v. Maryhaven Center of Hope*, 944 F.Supp. 158, 163 (E.D.N.Y.1996) (citations omitted)(denying application of alter ego theory on facts pled).

"The alter-ego cases present a scenario where the individual supervisor had an ownership stake in the employing entity." *Canabal v. Aramark Corp.*, 48 F.Supp.2d 94, 97–98 (D.Puerto Rico 1999). Where the manager/harasser has no such stake, application of the alter ego theory is inappropriate. See *id.* In the instant case, plaintiff has not made any allegations suggesting that Egly had any equity in Metro–Plex. In fact, the facts show that Illig is 100% owner of the corporation doing business as Metro–Plex, (Dk. 133, Illig depo., p. 10).

A common element in establishing individual liability, as is evident in *Lane*, *Curcio* and other case law, is the control of the individual defendant in relation to the employing entity. As the facts recited in previous sections of this memorandum make clear, it is Egly, not Illig, who is the "bad actor" for purposes of the Title VII, ADA, and KAAD claims made by plaintiff. Although Egly exercised a great deal of dominion and control over the day to day activities at Metro–Plex after he took over the day to day operations and management of the corporation in October of 1993, (Dk. 122, Illig depo., p. 51) Egly was in Lenexa and not in Topeka on a daily basis, and had no ownership stake in Metro Plex. Under these facts, the court finds insufficient basis for determining that Egly is the alter ego of Metro–Plex. Egly's acts will bind the corporation, but Egly can have no individual liability for those acts, because he is not the "employer," even under an alter ego analysis.

The facts do show a lack of respect by Illig for Metro–Plex's separate corporate identity. Illig, the 100% owner of the corporation, served as the secretary and treasurer of Metro–Plex, and as president and/or chairman (Id., p. 46–47); was responsible for keeping the corporate rec-

ords, but was unaware of where the corporate minutes were kept (Id., p. 47–49); could not recall when the last stockholders' meeting occurred, or who attended it (Id., p. 48); and was unaware of what the Articles of Incorporation or by-laws provided regarding annual or other periodic meetings of the corporation (Id., p. 48–49). Plaintiff has failed to show, however, that Illig exercised any dominion and control with respect to the discriminatory events alleged, nor has plaintiff shown that Illig's domination and control was used to commit any wrong against the plaintiff which proximately caused her injuries. See *Lane*, 944 F.Supp. at 163.

In each of the cases cited above which have found the alter ego theory viable, the alleged harasser was none other than the owner, who exercised dominion over the working conditions in the place of employment. See *Lloyd, Chinn, Janopoulos*. Here, Egly exercised dominion and control over plaintiff with respect to the alleged discriminatory acts, but Illig, who did not, was the sole owner of the company at all times relevant to this case. The court finds no reason to apply the alter ego doctrine under these facts.[9] Neither Illig nor Egly is individually liable as the "employer" for purposes of plaintiff's discrimination claims.[10] Accordingly, the individual defendants' motion for summary judgment on plaintiff's Title VII, ADA and KAAD claims will be granted.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Dk.120) is denied in part, and granted in part, in accordance with the terms of this memorandum.

---

**9.** Nor does plaintiff show facts sufficient to prove an alter ego theory under traditional law. See *Amoco Chemicals Corporation v. Bach*, 222 Kan. 589, 594, 567 P.2d 1337 (1977).

**10.** Although *Lloyd* and *Chinn* were Title VII cases, *Janopoulos* was a Title VII and ADA case. For reasons set forth in this court's Memorandum and Order on defendants' previous Motion to Dismiss, the rulings regarding individual liability under Title VII will be applied to plaintiff's KAAD and ADA claims as well. See *Land v. Midwest Office Technology, Inc.*, 979 F.Supp. 1344 (D.Kan.1997).