**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 31 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

ANNA NIETO, BETTY DELOSANTOS,
PATRICK SANCHEZ, SALLY NETSCH,
PHYLLIS DEBAUN, and MARY GONZALES,

    Plaintiffs-Appellees,

v.

QUADRAT KAPOOR,

    Defendant-Appellant.

No. 00-2121

---

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-96-1225-MV)

---

Mark Jarmie (Rosario Dyana Vega with him on the briefs) of Sharp & Jarmie,
P.A., Albuquerque, New Mexico, for Defendant-Appellant.

Tandy Hunt of Tandy Hunt, P.C., Roswell, New Mexico (Randy Clark of Randy
K. Clark, P.C., Roswell, New Mexico; and Kathryn Hammel of Cates & Hammel,
P.C., Albuquerque, New Mexico, with him on the brief), for Plaintiffs-Appellees.

---

Before **SEYMOUR**, **HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Anna Nieto,[1] Betty DeLosSantos, Patrick Sanchez, Sally Netsch, Phyllis DeBaun, and Mary Gonzales brought this action under 42 U.S.C. §1983 against Dr. Quadrat Kapoor, the Eastern New Mexico Medical Center ("ENMMC"), and a number of ENMMC supervisors. Plaintiffs asserted the denial of their Fourteenth Amendment right to equal protection of the laws, violation of their First Amendment right to free expression by retaliation for protected speech, and a tort claim for intentional infliction of emotional distress. All defendants but Dr. Kapoor settled with plaintiffs and were dismissed from the case. After a bench trial, the district court awarded damages against Dr. Kapoor and in favor of various plaintiffs on various claims in a total amount of $3,750,000. Dr. Kapoor appeals, and we affirm.

## I

Dr. Kapoor was the Medical Director of the Radiation Oncology Department at ENMMC in Roswell, New Mexico. Plaintiffs were employees of the ENMMC in Dr. Kapoor's department. The ENMMC was owned by Chaves County, New Mexico, and operated pursuant to and under the New Mexico Hospital Funding Act for governmental hospitals. The hospital utilized its governmental entity status to avoid paying jury fees in civil litigation and to

---

[1] Anna Nieto failed in all of her claims in the district court. She has not filed a cross-appeal in this case.

invoke the benefits and protections of the New Mexico Tort Claims Act, N.M. STAT. ANN. §§ 41-4-1, *et seq* (1996 repl.). As a governmental entity, ENMMC was regulated by and operated pursuant to the New Mexico Open Meetings Act. The members of the ENMMC Board of Trustees were appointed by the Chaves County Board of Commissioners.

Dr. Kapoor was not an employee of ENMMC, but worked instead under a contractual agreement with the hospital. The contract granted Dr. Kapoor professional privileges, leased office space, and maintenance of all his patient files.[2] Dr. Kapoor and ENMMC equally split all fees for patient care. In return, Dr. Kapoor provided medical care for patients of the hospital, oversaw hospital employees engaged in patient care, and conducted training for employees. Under the policies and procedures of the hospital, he was responsible for making decisions concerning diagnosis and treatment therapy, ordering necessary treatments for patients, informing Radiation Oncology staff of new developments in treatment and updating their knowledge of radiation treatment protocols, establishing goals of treatment for patients and informing staff personnel of these goals and educating the medical staff in cancer patient care, including the use of medical equipment. Dr. Kapoor agreed to abide by ENMMC's medical staff bylaws, rules and regulations. Although he did not have actual authority to hire,

---

[2] The contract also provided that Dr. Kapoor would pay rent for his office space. At no time did he actually pay such rent, however.

fire, or discipline Radiation Oncology employees, Dr. Kapoor influenced staffing decisions such as interviewing and evaluating potential employees, discussing with the Administrative Director problems with employees, and making recommendations for staffing patterns.[3]

In his position as Medical Director of the Radiation Oncology department, Dr. Kapoor had regular contact with each of the plaintiffs, overseeing their work and interacting with them in hallways, offices, patient waiting rooms, and examination rooms. These interactions took place one-on-one, in staff meetings, and in the presence of patients, fellow employees, and supervisors.

Dr. Kapoor's actions and statements of a racially and sexually harassing nature are too many to detail in this opinion. A summary will suffice to give a sense of his conduct. Dr. Kapoor made many derogatory comments about Latino people to hospital employees. The record demonstrates that at on at least thirteen occasions, Dr. Kapoor specifically referred to Mexicans as "stupid," "lazy," or both. For example, on one occasion Dr. Kapoor yelled at Ms. DeLosSantos, "I'm

_____

[3] Even without the official authority, Dr. Kapoor held himself out to employees as having authority to hire, fire, or discipline employees working under his direction. On numerous occasions he made comments that would reasonably lead one to the conclusion that he possessed such power. For instance, at a staff meeting Dr. Kapoor stated to Ms. DeBaun, "If you are going to be such a whiny woman and so overly sensitive about things, then this was never going to work and you should seek employment elsewhere." App., vol. 2, at 650. In another example, Dr. Kapoor yelled at Ms. DeLosSantos, "I'm going to have to fire you. You are so stupid." App., vol. 5, at 1192.

going to have to fire you. You are so stupid. You don't even know where you put this patient in. . . . You're just like all the other Mexicans around here, lazy and stupid, always wanting to take siestas." App., vol. 5, at 1192. In many cases, these comments were made directly to a plaintiff about the plaintiff personally. In others, Dr. Kapoor made the comments about one Latino employee in the presence of another (sometimes Latino) employee. On at least one occasion, Dr. Kapoor referred to Mexicans as "wetbacks," and spoke at least twice of his desire to exploit Mexican labor because it was "cheap." For example, Dr. Kapoor said to Mr. Sanchez that they should get together, start a farm, hire "a bunch of wetbacks," pay them two or three dollars per hour, and make a lot of money. App., vol. 3, at 908. In the presence of Ms. Gonzales, Dr. Kapoor told a white patient that her daughter had degraded herself and her family by marrying a Latino man.

Dr. Kapoor assigned employees to work tasks based on their race, preventing or discouraging Latino employees from treating white or "VIP" patients. Dr. Kapoor told Ms. DeLosSantos not to have contact with one patient because the patient was "not of her kind." *Id.* at 1196. He assigned Ms. Netsch, a white nurse who is a plaintiff in this action, to care for patients who were white because, he said, they were not Ms. DeLosSantos' "kind." App., vol. 1, at 409.

Dr. Kapoor also offered different levels of treatment to hospital patients

based on their race. At times he refused to treat Latino or African-American patients. At other times, he gave them less attention and care than white patients. Ms. Netsch observed that Dr. Kapoor would physically touch white patients, would touch Latino patients only when wearing gloves, and would not touch African-American patients at all. *Id.* at 405.

Dr. Kapoor had no such aversion to physically touching his Latino staff members. He regularly pushed and pulled employees down the hall and grabbed things from their hands. He pointed fingers in their faces as he yelled at them. He also threw such things as pencils, medical charts, and records at them. In the most disturbing example, the Doctor threw a three-inch thick, hardback copy of the Physician's Desk Reference at Ms. Gonzales, hitting her in the chest. Testimony showed that these and other racially-based incidents were humiliating and degrading.

Dr. Kapoor's demonstrated enmity for Latinos and African-Americans was matched by his feelings about women, both those under his supervision and those under his care. He repeatedly described women as being "whiny" and "overly sensitive" or "stupid." He made numerous comments characterizing women as greedy or weak. He said to Ms. Netsch, "why a man would marry a woman was, number one, just to be their lover when they are young, to give them children in their middle ages, and then just to take care of them as they got older." *Id.* at

407. He made similarly sexist comments to and about female patients. He told Mr. Sanchez that it was a breast cancer patient's own fault that her husband was being unfaithful to her because she was weak and should be home with her family rather than working in a store.

Dr. Kapoor assigned female employees certain tasks and prevented them from performing others because of their gender. For instance, he directed Ms. DeLosSantos to replace paper in the photocopier and clean the nurse's station. He did not assign such tasks to male employees. When treating patients or performing simulations, Dr. Kapoor requested assistance from male employees with significantly less experience in radiation therapy rather than having well-qualified female employees perform such tasks. He similarly preferred male employees over female employees in the provision of training.

When female employees asked questions or attempted to point out problems in patient care, Dr. Kapoor would often yell at them or ignore them altogether, sometimes accepting from male employees the very information female employees had just attempted to offer him. He regularly pulled and pushed female employees. On at least one occasion he slapped Ms. DeBaun's hands away from an x-ray she was trying to turn the correct way. He also threw objects at female employees. In addition to the Physician's Desk Reference mentioned above, Dr. Kapoor threw x-rays, patient charts, and files.

Dr. Kapoor treated female patients differently than male patients, offering them less privacy, time, and respect. Most outrageous were incidents where Dr. Kapoor engaged in behavior that degraded female breast cancer patients. He pointed to one patient's post-cancer, reconstructed breasts and said she should be home sexually pleasing her husband. On more than one occasion, Dr. Kapoor was observed unnecessarily exposing women's breasts to male and female hospital staff, physically touching (and on one occasion tweaking) their nipples with no medically-based justification, then calling male employees into the room to observe the consequent reaction. His treatment caused patients to cry.

Dr. Kapoor's racist and sexist behavior interfered with staff members' ability to perform their duties at the hospital, including preventing them from providing care to patients. He excluded certain employees from interacting with some patients, prevented them from engaging in training simulations, yelled at employees when they had questions regarding treatment and procedures, and caused some employees to leave work as a result of his conduct. He so poisoned the working environment through his mistreatment of patients and employees that the fundamental mission of the Radiation Oncology department was compromised.

All five plaintiffs left the hospital because of Dr. Kapoor's treatment of employees. Some were subsequently unemployed or under-employed for a significant period of time. At the time of the district court's decision, Ms. Netsch

had still not found comparable work in her field of expertise. Ms. DeBaun had trouble finding full-time employment and eventually left nursing altogether. Mr. Sanchez had not found a comparable job with comparable pay. Ms. Gonzales had only found work as a temporary nurse. Ms. DeLosSantos began working in a nursing home for less pay and prestige. The district court found that all five had suffered a variety of psychological traumas: lack of sleep and nightmares, extreme weight-loss or -gain, regular alcohol consumption, headaches, muscle spasms, and general stress.

This case was originally filed in state court. Defendants removed it to federal court in September 1996. Thereafter, Dr. Kapoor sought summary judgment on whether he acted under color of state law for section 1983 purposes. The district court denied that motion. In December 1999, nearly a month after the close of discovery, Dr. Kapoor moved to compel plaintiffs to supplement their responses to discovery requests regarding damages. The magistrate denied the motion. Following a bench trial, the district court found Dr. Kapoor liable for hostile work environment racial and sexual harassment, retaliation for protected speech in violation of the First Amendment with regard to Netsch and Sanchez only, and intentional infliction of emotional distress. The court awarded damages against Dr. Kapoor in the total amount of $3,750,000.[4]

_____

[4] Ms. DeLosSantos was awarded $500,000 in compensatory damages and
(continued...)

Dr. Kapoor contends on appeal that the district court erred in the following respects: (1) by denying summary judgment on the state actor claim prior to trial; (2) by denying Dr. Kapoor's motions during the trial for judgment as a matter of law on the hostile environment claims; (3) by denying his motions requesting that the court either compel plaintiffs to supply additional discovery or issue sanctions for failure to comply; (4) and by its award of compensatory and punitive damages. We address each issue in turn.

## II

### A. State Action

Dr. Kapoor contends the district court erred in holding he was a state actor for purposes of section 1983. This is a question of law that we review *de novo*. *Dang v. UNUM Life Ins. Co.*, 175 F.3d 1186, 1189 (10th Cir. 1999).

To be successful, section 1983 claimants must make two showings to establish that the conduct at issue constituted state action. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or

---

[4](...continued)
$500,000 in punitive damages. Ms. Netsch was awarded $250,000 in compensatory damages and $250,000 in punitive damages. Ms. DeBaun was awarded $375,000 in compensatory damages and $375,000 in punitive damages. Mr. Sanchez was awarded $500,000 in compensatory damages and $500,000 in punitive damages. Ms. Gonzales was awarded $250,000 in compensatory damages and $250,000 in punitive damages.

by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982). "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.*

We take *Lugar*'s second prong first. The Court held in *Lugar*, that "state employment is generally sufficient to render the defendant a state actor." *Id.* at 936 n.18. In the present case, Dr. Kapoor was not directly employed by the state. Rather, he and the hospital had a contractual agreement regulating his position at ENMMC. In *West v. Atkins*, 487 U.S. 42 (1988), the Court refused to recognize a dispositive distinction between actors employed directly by the state and those affiliated with the state under a contractual arrangement. "It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *Id.* at 55-56. In *West*, the state of North Carolina contracted with a private physician to provide orthopedic services to inmates of the state prison system. The doctor's contractual duties included providing medical care, performing surgery, and supervising Department of Corrections nurses and physician's assistants who were subject to his orders. *Id.* at 44 n.1. The Court focused on the relationship between the State, the physician, and the prisoner. Because they were incarcerated, prisoners did not have a choice of doctors and therefore could not

-11-

look elsewhere for their medical care. The Court concluded, "Respondent as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of §1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State." *Id.* at 54.

The facts related to the relationship in this case between the state, Dr. Kapoor, and the hospital staff, while not identical, lead us to the same conclusion. Dr. Kapoor was obligated by a contract with the State, here represented by the ENMMC, to provide patient care, supervision over hospital staff in the provision of patient care, and training of hospital staff. While not "incarcerated" in their jobs, employees in the Radiation Oncology department could not choose to whom they would answer. Hospital hierarchies are well-established. Nurses and assistants answer to the doctors. Dr. Kapoor, as Medical Director of the department, was the only person to whom they could look for orders and training.

Just as the outsourcing of prison medical care to a private contractor did not relieve the State of its constitutional duty under the Eighth Amendment to provide adequate medical treatment to those in its custody in *West*, hiring a private doctor here to perform supervisory duties does not relieve the State of its constitutional duty to provide equal protection under the 14th Amendment to its employees. We thus conclude that Dr. Kapoor, like the physician in *West*, acted

under color of state law for purposes of section 1983 when undertaking his supervisory duties over plaintiffs' work.

We next look to *Lugar*'s first prong, which requires that the deprivation be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the state is responsible. *See Lugar*, 457 U.S. at 937. ENMMC contracted with Dr. Kapoor to run the hospital's cancer treatment program. He served as the Medical Director of the ENMMC's Radiation Oncology department. He was responsible for providing patient care, overseeing hospital employees in the Radiation Oncology department, and conducting training of those employees. His office was located in the hospital, hospital employees maintained his patient files, and patient fees were split evenly between the doctor and the hospital. Advertisements listed Dr. Kapoor as a radiation oncologist at the hospital. As a physician at ENMMC, Kapoor agreed to abide by the hospital's bylaws, rules, and regulations.

In his position, Dr. Kapoor directed most of the Radiation Oncology employees' work. Plaintiffs considered him their supervisor and acted in accordance with his direction. His duties included influencing staffing decisions by interviewing and evaluating potential employees, discussing with the Administrative Director problems with employees, and making recommendations

for staffing patterns.[5]

This court has stated that "there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995). We agree with the district court's reasoning regarding the existence of such a nexus. "Dr. Kapoor was able to harass Plaintiffs because of his state authority as the Medical Director of a public radiation oncology department and because he supervised their work." *See*, App. at 1872. Both prongs of *Lugar* thus satisfied, we find Dr. Kapoor was a state actor for purposes of section 1983.

## B. Hostile Environment Claim

Dr. Kapoor asserts the district court should have granted his Rule 50 motions for Judgment as a Matter of Law on the grounds of insufficient evidence to establish his conduct created a hostile work environment. As this case involved a bench trial rather than a jury trial, Rule 50 is inapplicable. *See* Fed.R.Civ.P. 50, 52(c); *see also Transwestern Publ'g Co. LP v. Multimedia Mktg.*

---

[5] Even were we to agree that Dr. Kapoor lacked actual authority, the facts demonstrate apparent authority. *See Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995) (authority of state actor may be either actual or apparent). As we have mentioned, testimony showed that Dr. Kapoor yelled at one plaintiff, "I'm going to have to fire you, you are so stupid!" App., vol. 5, at 1192. To another, he said, "[I]f you are going to be such a whiny woman and overly sensitive about things, then this was never going to work and you should seek employment elsewhere." App., vol. 2, at 650.

*Assocs., Inc.,* 133 F.3d 773, 775 (10th Cir. 1998); 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2523 (2d ed. 1994).

A motion for judgment made in a trial to the court at the close of the plaintiffs' evidence is now governed by Fed.R.Civ.P. 52(c), which requires the court to make findings of fact and conclusions of law if it grants the motion. The district court denied Dr. Kapoor's motions made at the close of plaintiffs' evidence and at the end of all the evidence. As a result, we treat his argument on appeal as a challenge to the factual and legal sufficiency of the district court's determinations based on all the evidence. *See Northwest Drilling, Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 37 (1st Cir. 2001). We review the district court's fact findings for clear error and its legal conclusions de novo. *Id.* "A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *Tosco Corp. v. Koch Indus., Inc.,* 216 F.3d 886, 892 (10th Cir. 2000) (quotation omitted).

As discussed below, after reviewing the evidence we are not left with such a conviction regarding the district court's findings of fact and agree with the district court's conclusions of law. In fact, Dr. Kapoor's challenge to the hostile environment judgment premised on a purported insufficiency of the evidence is surprising. This is not a case on the cusp; this is a case well over the edge.

-15-

The law on discrimination arising from a hostile environment in the workplace is well established. In *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 73 (1986), the Supreme Court held for the first time that hostile work environment sexual harassment is a form of discrimination actionable under Title VII of the 1964 Civil Rights Act. *See also Patterson v. McLean Credit Union*, 491 U.S. 164, 179-80 (1989) (harassment based on racial animus is actionable under Title VII). We recognized hostile environment racial and sexual harassment as a form of Title VII discrimination in *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412-13 (10th Cir. 1987). In *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989), we held sexual harassment actionable under the Fourteenth Amendment right to equal protection of the laws.

On appeal, Dr. Kapoor contends there was insufficient evidence to establish the severity or pervasiveness requirement laid out in *Meritor* and its progeny.[6] "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67 (quoting *Henson v. City*

---

[6] In making this argument, Dr. Kapoor relies in part on our opinion in *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531 (10th Cir. 1995), where we distinguished between a hostile working environment and one that is merely unpleasant. We focused there on the fact that the events in question took place in the context of a "blue collar" construction site. *See also Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). The conduct here, however, was constitutionally offensive in any setting.

*of Dundee*, 682 F. 2d 897, 904 (11th Cir. 1982)); *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

Since its decision in *Meritor*, both the Supreme Court and this Court have clarified the meaning of "hostile environment" and the facts necessary to prove such a claim. In deciding whether or not a hostile environment existed, it is necessary to look to all the circumstances involved in the situation. These may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Lockard v. Pizza Hut, Inc.,* 162 F. 3d 1062 (10th Cir. 1998).

Dr. Kapoor contends the incidents here were not sufficiently frequent, citing two decisions in this court where the facts revealed one or two incidents that were unquestionably racist or sexist but were held insufficient to constitute a hostile environment. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1539-40 (10th Cir. 1995); *Bolden v. PRC Inc.*, 43 F.3d 545, 549 (10th Cir. 1994). His reliance on those cases is misplaced, however, because here the incidents of sexual and racial harassment were of a troubling frequency.

The record reflects dozens of statements and actions made directly to and in the presence of plaintiffs.[7] We have counted more than thirteen examples where

---

[7] Dr. Kapoor also attempts to limit the pervasiveness of his actions by tying
(continued...)

Dr. Kapoor referred to Latinos – both those employed by the hospital and those at the hospital as patients – as "stupid," or "lazy" "Mexicans." The record reveals at least ten instances when Dr. Kapoor referred to women as "whiny" or "overly sensitive," or made statements about what Dr. Kapoor believed to be women's "proper" place in society.[8] For example, Dr. Kapoor asked Ms. DeBaun why she had not given her second husband a child and why she had left her first husband if she had given him a child. These examples illustrate only Dr. Kapoor's *oral* statements. His other actions – ignoring or yelling at female employees when they attempted to ask questions or raise concerns about patient care, pushing or dragging plaintiffs around the hospital, humiliating female patients, refusing to treat or touch Latino and African-American patients – further contribute to a finding that his harassment was frequent.

---

[7](...continued)
specific actions to specific plaintiffs. For example, he writes, "Plaintiff Sanchez worked with Dr. Kapoor for over four years, but could recall only two or three statements which Dr. Kapoor made to him that were offensive." Aplt. Br. at 21-22. A finding of pervasiveness or severity need not rest solely on actions aimed directly at a plaintiff, however, but may also consider harassment of others in the workplace. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-16 (10th Cir. 1987); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995); *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994).

[8] The tabulation of incidents should in no way be interpreted as setting a benchmark for this or future cases. On this matter, "while courts have tended to count events over time to determine pervasiveness, the word 'pervasive' is not a counting measure. The trier of fact utilizes a broader contextual analysis." *Smith v. Northwest Fin. Acceptance Inc.*, 129 F.3d 1408, 1415 (10th Cir. 1997).

Dr. Kapoor's conduct was also sufficiently severe. As the Supreme Court made clear in *Harris*, the test of severity in hostile environment claims does not require that the offending conduct seriously affect plaintiffs' psychological well-being. *Harris*, 510 U.S. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct."). Nevertheless, plaintiffs presented ample evidence that Dr. Kapoor's actions did in fact seriously affect their psychological well-being. All five sought help from a counselor at the hospital. Ms. Netsch suffered from sleep problems and lost ten pounds. Ms. DeBaun also had trouble sleeping, lost weight, cried daily, and suffered from migraine headaches, muscle spasms, and body aches. After leaving ENMMC, Ms. DeBaun retired from radiation therapy altogether because Dr. Kapoor's treatment made her lose confidence in her abilities. Mr. Sanchez suffered from depression and overeating, gaining 100 pounds. Ms. Gonzales suffered loss of self-esteem, fear, nightmares, and sadness. She frequently cried, suffered from nausea, and lost her appetite. Ms. DeLosSantos suffered sleep problems, and went to the emergency room with chest pains and shortness of breath following one encounter with Dr. Kapoor.

Dr. Kapoor's behavior towards plaintiffs was regularly physically threatening and humiliating. He yelled at them, pointed his finger in their faces, called them "stupid," "whiny," and "lazy." Dr. Kapoor ignored or would not look

at plaintiffs when they were attempting to communicate with him. He grabbed materials out of their hands and pushed and pulled them down the hall as if they were unruly school children rather than trained professionals. He threw charts, papers, and other objects at employees. He once threw a three inch-thick hardbound book at Ms. Gonzales, hitting her in the chest. All this conduct occurred in front of supervisors, colleagues, and/or patients. He also engaged in humiliating behavior of the most extreme sort with patients. On more than one occasion Dr. Kapoor stimulated the exposed breasts of breast cancer patients and then encouraged male hospital staff to come observe. He would not touch Latino patients unless wearing gloves and would not touch African-American patients at all. His statements and actions relating to racial and gender inferiority were of a degrading and humiliating nature.

In *Lockard,* we held that, "Grabbing Ms. Lockard's hair and breast while she attempted to take [customers'] orders and serve their beer is physically threatening and humiliating behavior which unreasonably interferes with Ms. Lockard's ability to perform her duties as a waitress." *Lockard*, 162 F.3rd at 1072. Similarly, Dr. Kapoor's actions interfered with plaintiffs' abilities to perform their duties at the hospital. Dr. Kapoor also prevented plaintiffs from obtaining training and experience using machines by excluding them from simulations. He yelled at them or ignored them when they raised concerns or had

-20-

questions about patient care. Dr. Kapoor told Ms. DeLosSantos not to attend to white patients because they were "not her kind," after which she avoided contact with white patients in order to avoid Kapoor's wrath. He caused plaintiffs to miss work because of trauma inflicted by his actions. All five plaintiffs left the hospital and one left the medical field altogether as a result of his conduct.

In short, Dr. Kapoor's racist and sexist behavior infected his provision of medical care to patients, supervision of hospital staff, and training for that same staff which, in turn, interfered with the ability of plaintiffs to carry out their assigned duties. Separately and in the aggregate, Dr. Kapoor's actions undeniably altered "the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

Finally, a claimant in a hostile environment harassment case must show that the environment would be reasonably perceived (objectively), and is perceived (subjectively), as hostile or abusive. *Harris*, 510 U.S. at 21*; see Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998), *Smith,* 129 F.3d at 1413. Plaintiffs presented ample evidence of both. As the Supreme Court made clear in *Harris*, the determination of whether a hostile environment existed "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. In the case at hand, it is clear that the facts pass the test, and with flying colors. A hostile environment, created by Dr. Kapoor, clearly existed at the ENMMC.

## C. Discovery Claim

Dr. Kapoor challenges the denial of his belated motion to compel disclosures by plaintiffs of certain medical information and his mid-trial motion for sanctions based on plaintiffs' asserted failure to provide computations of damages claimed. He contends plaintiffs were required by the Federal Rules of Civil Procedure and the local rule of the District of New Mexico to disclose this information without a prior request therefore. *See* FED.R.CIV.P. 26(a)(1)(C) (requiring a party to provide computation of and evidence pertaining to damages claims); D.N.M.L.R.-Civ. 26.3(d) (requiring mandatory disclosure of certain medical information); and FED.R.CIV.P. 26(e) (requiring a party to supplement prior discovery).[9] These materials were relevant to plaintiffs' claims of verbal

---

[9] Local Rule 26.3(d) provides:
"Required Initial Disclosure. In all cases in which the physical or mental medical condition of the party is an issue, the party must:
(1) produce a list of the name, address and phone number of any healthcare provider, including without limitation, any physicians, dentists, chiropractors, mental health counselors, clinics and hospitals which have treated the party within the last 10 years;
(2) produce any records already in that party's possession;
(3) execute and produce a medical authorization release form as set forth in appendix "A". Within 10 days after receiving medical records by use of this authorization from a party must provide copies of such records to all other parties."
Federal Rule of Civil Procedure 26(a)(1)(C) governs required disclosures in the discovery process. Under the rule a party must, without awaiting a discovery request, disclose "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying . . . documents or

(continued...)

and emotional abuse and intentional infliction of emotional distress.

Discovery rulings are reviewed for an abuse of discretion. *GWN Petroleum Corp., v. OK-TEK Oil & Gas, Inc.,* 998 F. 2d 853, 858 (10th Cir. 1993). Under this standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Ortiz*, 804 F.2d 1161, 1164 n. 2 (10th Cir. 1986).

Local Rule 26.3(d) became effective on January 1, 1999, as a mandatory disclosure rule. Discovery in the case came to a close well before that date. Dr. Kapoor did not seek the disputed disclosures in writing until October 14, 1999, and waited until December 23, 1999, to file his Motion to Compel or Sanction. While the new local rule was applicable to all civil cases pending on January 1, 1999, D.N.M.L.R.-Civ. 1.3 (1999), the rule gives judges discretion whether or not to reopen discovery in cases where it has already closed. *Id.* (rule governs all cases pending "unless the court otherwise orders."). Although the Magistrate Judge in fact re-opened discovery three times in 1999 for limited reasons, this

---

[9](...continued)
other evidentiary material . . . on which such computation is based, including materials bearing on the nature and extent of injuries suffered. . . ." FED.R.CIV.P. 26(a)(1)(C).

    Federal Rule of Civil Procedure 26(e) requires supplementation and correction of discovery materials. FED.R.CIV.P. 26(e).

only highlights the failure of Dr. Kapoor to raise in a timely fashion reopening of discovery regarding the present issue. The district court did not abuse its discretion in denying Dr. Kapoor's motion as untimely.

Dr. Kapoor's claim relating to compulsory disclosures under Federal Rule of Civil Procedure 26(a)(1)(C) is similarly weak. That rule requires a party to provide a computation of damages claimed as well as evidence on which the computation is based. The record shows that such materials were in fact provided to counsel in this case. Dr. Kapoor was provided with tax returns from plaintiffs that reflected such information as moving expenses and lost wages. Further, extensive information relating to damages was provided to counsel for the hospital and other parties prior to settlement negotiations. As the district court noted, and counsel admitted, Dr. Kapoor was acting jointly with counsel for the other parties at that time, he had access to all this information, and he was present at the settlement negotiations. App. at 547. Finally, the district court's decision on sanctions was based on evidence offered at trial as well as on materials handed over in the discovery process. The district court did not abuse its discretion in denying Dr. Kapoor's request for sanctions with respect to Rule 26(a)(1)(C) disclosures.

*D. Damages claim*

Finally, Dr. Kapoor challenges the district court's award of compensatory and punitive damages, arguing the evidence was insufficient to support both findings. We view the evidence in the light most favorable to the prevailing party. *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1551 (10th Cir. 1996). We review the district court's underlying factual determinations regarding the amount of damages for clear error. *Dill v. City of Edmond*, 155 F.3d 1193, 1208-09 (10th Cir. 1998).

Dr. Kapoor argues that the district court's "creation of the compensatory damages was wholly unsupported by any evidence placed before it." Aplt. Br. at 27. However, he fails to cite to the record or to any relevant caselaw in support of this contention. Having reviewed the record and plaintiffs' brief, with its references to ample evidence and caselaw in support of its argument on damages, we affirm the district court's award of compensatory damages.

We also affirm the district court's awarding of punitive damages. Dr. Kapoor contends the award of punitive damages lacked sufficient basis in the evidence. The district court's determination of whether sufficient evidence exists to support punitive damages is a question of law that we review *de novo*. *See Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1269 (10th Cir. 2000).

According to New Mexico law,[10] an award of punitive damages "is permissible upon a finding that the wrongdoer's conduct was willful, wanton, malicious, reckless, oppressive, grossly negligent, or fraudulent and in bad faith. Any one of the reasons for assessing punitive damages is sufficient to sustain an award." *Downs v. Garay*, 742 P.2d 536 (N.M.Ct.App. 1987). Punitive damages are left to the discretion of the trier of fact, but they should not be so unrelated to injury and actual damages proven as to plainly manifest passion and prejudice rather than reason and justice. *Weidler v. Big J Enter., Inc.*, 953 P. 2d. 1089, 1101 (N.M.Ct.App. 1997).

Under federal law in a section 1983 action, a finding of punitive damages requires that the defendant's conduct "is shown to be motivated by evil motive or intent," or "involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The district court here found Dr. Kapoor's conduct was "intentional, willful, and malicious." App. at 1889. The record clearly supports this conclusion. We are persuaded that under any of these standards, Dr. Kapoor's conduct merited a finding of punitive

---

[10] Dr. Kapoor cites to New Mexico law without explaining how the decisions correlate with the state and federal claims on which punitive damages were awarded. Plaintiffs cite exclusively to federal law without explaining how these cases correlate to the issues. As discussed in text, our decision does not hinge on the choice of one law over the other. *See Mason v. Oklahoma Turnpike Auth.*, 182 F.3d 1212, 1213 (10th Cir. 1999) (abuse of discretion standard governs review of district court punitive damages award under both state and federal law).

damages.

At a time when there is a shortage of men and women entering the nursing profession,[11] Dr. Kapoor's behavior – which led at least six people to leave the ENMMC, some to leave the state, and some the profession of nursing altogether – affected not only the patients,[12] plaintiffs, and other employees of the Eastern New Mexico Medical Center, it arguably impacted the overall public health. Under the facts of the case, the damages awarded, both compensatory and punitive, are supported by reason and justice.

For the foregoing reasons, we **AFFIRM** the district court opinion.

---

[11] Jackie Jadrnak, "*Nurses have* a hard time figuring how to fill all the job vacancies," ALBUQUERQUE JOURNAL, Aug. 11, 2001, at E2 (stating that vacancy rate in nursing positions is 21% in New Mexico hospitals); "*State's nurse shortage intensifying*," SANTA FE NEW MEXICAN, July 30, 2001 at A4.

[12] Medical ethics in the Hippocratic tradition entreat doctors to "First, do no harm." Robert M. Veatch, *A Theory of Medical Ethics: The Hippocratic Tradition*, *in* LAW, SCIENCE AND MEDICINE 273-274 (Judith Areen et al, eds., 1984). The American Medical Association's Principles of Medical Ethics similarly exhort, "A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights," as well as, "A physician shall respect the rights of patients, colleagues, and other health professionals. . . ." Am. Med. Ass'n. House of Delegates, Principles of Medical Ethics (2001).