**Evan T. WATSON, Plaintiff,**

v.

**CITY OF TOPEKA, Defendant.**

**No. 00–4162–JAR.**

United States District Court, D. Kansas.

Dec. 27, 2002.

1224

## MEMORANDUM OPINION AND OR-DER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDG-MENT

ROBINSON, District Judge.

This comes before the Court on Defendant's Motion for Summary Judgment (Doc.30) on all of Plaintiff's claims: racial discrimination based on a hostile work environment in violation of Title VII[1] and the Kansas Act Against Discrimination;[2] and outrageous conduct, or intentional infliction of emotional distress. Having considered the memoranda filed by the City of Topeka (Defendant) and Evan T. Watson (Plaintiff), the Court grants the motion for summary judgment because Plaintiff has failed to establish employer liability and has failed to show the threshold requirements for the tort of outrage under Kansas law.

## I. FACTS

The following facts are taken from the summary judgment record and are either stipulated, uncontroverted or viewed in the light most favorable to Plaintiff's case. The Court ignores factual assertions that are immaterial, or unsupported by affidavits and/or authenticated and admissible documents. The Court also disregards conclusory statements.

Plaintiff Evan T. Watson, an African–American man, was hired by the Defendant in 1988. At all times relevant to this action, Plaintiff was the Section Manager of the Streets Section of the Transportation Operations Division of the Public Works Department. Plaintiff's duties as Section Manager included handling personnel issues. On two occasions during Plaintiff's tenure as Section Manager, Haggerty, an African–American employee under Plaintiff's supervision, complained of co-workers making racial slurs. Haggerty complained to Plaintiff that Haggerty's co-worker, Yocum, used the term "nigger-rigged" in the workplace. Plaintiff was not present when Yocum made this slur. Yocum was terminated as a result of making this racial slur; and Plaintiff believes termination was an appropriate response. On another occasion, Haggerty complained to Plaintiff that co-worker Terry Fisher was using the term "porch monkey" in the workplace. Plaintiff suspended Fisher for this conduct, and thereafter had no more problems with Fisher using racial slurs. Plaintiff believes his suspension of Fisher was sufficient and appropriate. Plaintiff could not recall any instances in his section, where reported incidents of racial slurs, jokes or comments were not handled appropriately.

Plaintiff and Ken Donaldson stated that they were subjected to conduct motivated by racial animus. Donaldson, then Plaintiff's immediate supervisor, was the only other minority at the management level in the Public Works Department. Until Donaldson was hired, Plaintiff was the highest ranking black man in a supervisory or management position.

Plaintiff testified that Mike McGee, then the deputy director of public works, committed the following acts directed toward Plaintiff: jerking paperwork out of Plaintiff's hand and tearing it up; telling Donaldson that Plaintiff was a pipeline to the community and that Plaintiff needed to be shut down; investigating or inquiring into how the church where Plaintiff pastors was built; and allowing others to circumvent

---

**1.** 42 U.S.C. § 2000e *et seq.*

**2.** Kan. Stat. Ann. 44–1000 *et seq.*

Plaintiff's authority. Plaintiff further testified that McGee never made racial slurs, jokes or comments in Plaintiff's presence, but Plaintiff believes that McGee's actions were racially motivated based on McGee's actions towards him and towards Donaldson.

In an exit interview, Donaldson stated that one reason he was leaving was the unpleasant work environment. He characterized the environment as one where "[m]inorities have been the victims of racist action from slurs to effigies." He also characterized McGee's conduct as "hateful" and "bad behavior." Plaintiff testified that McGee had denied promotion to a black female employee approved by Donaldson, changing the job qualifications for the position to exclude the applicant for racially motivated reasons. Although Defendant questions whether Plaintiff had personal knowledge of this incident, it does not controvert Plaintiff's assertion. Donaldson further stated in his exit interview that McGee's ". . . bad behavior was emboldened and continued because an official investigation was never conducted after numerous complaints about his actions. In fact, on one occasion when his conduct was brought to the Mayor's attention, John Arnold gave him the responsibility to investigate himself. He immediately came after the employees." Donaldson also stated that "[a]nother major source of disrespect I feel came from some white employees who constantly addressed issues to PWA in lieu of me. They were allowed to continue even after I identified them and their actions to my supervisors. They could make statements of fact and allegations without proof. I had to provide evidence to dispute them, which at times upset me. Because of this I feel that I was being tagged as hostile." Donaldson also described the Public Works Department as an area of "dysfunction," evidenced by the number of people at odds with the last two directors of the department; and the fact that Donaldson and Donaldson's predecessor were both "incompatible" with McGee.

In addition to the problems with McGee, Plaintiff was subjected to another racially offensive incident at the hands of Edie Snethen, then the director of the Public Works Department. At a meeting on September 17, 1999, Snethen gave a Power Point slide presentation to a group of 25–30 employees, including the heads of the public works, water and transportation operations departments. To illustrate what she felt like during the budgeting process, Snethen showed a slide depicting the whipping of a black male slave tied to a whipping post. Plaintiff testified that before this, he had never heard Snethen make racial slurs or comments. However, Plaintiff believed that as the head of public works, Snethen had engaged in excluding blacks from upper management.

Plaintiff was distressed by Snethen's comment, and complained to Snethen, Donaldson and the Mayor. Snethen responded that she saw nothing wrong with the slide because it depicted that the next man to be whipped was white. Plaintiff noted that just prior to Snethen's presentation that day, Snethen had attended a meeting where the discouragement of racially disparaging comments was discussed. Plaintiff also complained to Donaldson and to Mayor Wagnon. Plaintiff testified that by the time he signed a complaint with the Defendant, Snethen "was gone." Snethen was replaced by Jeff White, who Plaintiff states tried to deny Plaintiff's vacation leave after Plaintiff's supervisor had approved the leave.

Plaintiff testified that he suffered severe emotional distress from these incidents, having to be prescribed anti-depressants after the Snethen incident. Plaintiff fur-

ther testified that his doctor mentioned post-traumatic stress disorder; but Plaintiff did not testify that the doctor diagnosed that disorder.

## II. DISCUSSION

### *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3] The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact.[4] Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[5] The nonmoving party may not rest on its pleadings but must set forth specific facts.[6] The court must consider the record in the light most favorable to the party opposing the motion.[7] The court determines "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."[8] If an inference can be deduced from the facts that would allow the nonmovant to prevail, summary judgment is inappropriate.[9]

### *Hostile Work Environment*

To survive a summary judgment motion on a hostile work environment claim under Title VII or the KAAD,[10] "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment;" and that the harassment was motivated by racial animus.[11] In requiring a showing of a workplace permeated by discriminatory conduct that is severe or pervasive, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[12]

---

3. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993).

4. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okl.,* 942 F.2d 737, 743 (10th Cir.1991).

5. *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990) (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548).

6. *Id.*

7. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

8. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

9. *United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (citation omitted).

10. Title VII analysis is applied to the KAAD. *See, e.g., Best v. State Farm Mutual Automobile Ins. Co.,* 953 F.2d 1477, 1480 n. 2 (10th Cir.1991); *Roberts v. The Signature Group,* 1996 WL 707106 at *2 n. 5 (D.Kan.1996) (citing *Woods v. Midwest Conveyor Co., Inc.,* 231 Kan. 763, 767, 648 P.2d 234 (1982)).

11. *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1261 (10th Cir.1998), *cert. denied* 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999) (quoting *Davis v. U.S. Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir. 1998)).

12. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII was not meant to be a "general civility code."[13] " '[S]imple teasing,' ... offhand comments, and isolated incidents (*unless extremely serious*) will not amount to discriminatory changes in the 'terms and conditions of employment.' "[14] On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[15] Although generally Plaintiff must identify "more than a few isolated incidents of racial enmity,"[16] the determination of whether a hostile environment existed "is not, and by its nature cannot be, a mathematically precise test."[17]

■ The court should consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[18] This consideration of the totality of the circumstances is warranted, "because the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation," but should be examined in the context in which they occurred.[19] As the Supreme Court noted in *Oncale v. Sundowner Offshore Services, Inc.*[20]:

> (t)he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.[21]

■ This "constellation" of circumstances must be evaluated both subjectively and objectively.[22] Actionable conduct is that which a reasonable person in the victim's position would find hostile or abusive, and that which the victim subjectively perceives as hostile or abusive.[23]

■■ Plaintiff complains of derogatory slurs, "nigger-rigged" and "porch monkey," directed at Haggerty by two co-workers, Yocum and Fisher. Defendant argues that this conduct, since not directed at Plaintiff, cannot support Plaintiff's hostile work environment claim. While Plaintiff must produce evidence that he was the

---

**13.** *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662 (1998) (citations omitted).

**14.** *Id.* (citation omitted and emphasis added).

**15.** *Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir.2001) (citation omitted).

**16.** *Penry*, 155 F.3d at 1263 (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir.1987)).

**17.** *Nieto*, 268 F.3d at 1220 (citation omitted).

**18.** *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

**19.** *McCowan v. All Star Maintenance, Inc.* 273 F.3d 917, 925 (10th Cir.2001) (citations omitted).

**20.** 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**21.** *Id.*

**22.** *Nieto*, 268 F.3d at 1220 (citations omitted).

**23.** *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1435, 152 L.Ed.2d 380 (2002).

object of harassment,[24] evidence of a general work atmosphere, as well as evidence of a specific hostility directed toward the plaintiff, is an important factor in evaluating the claim.[25] The Tenth Circuit has recognized that "[a] finding of pervasiveness or severity need not rest solely on actions aimed directly at a plaintiff, however, but may also consider harassment of others in the workplace."[26]

Therefore, evidence of the harassment of Haggerty, Donaldson and other minorities may be considered in evaluating Plaintiff's claim of a racially hostile work environment. The record does not demonstrate whether Yocum or Fisher frequently used racial slurs in the workplace. Plaintiff was aware of only one such incident for each of these employees, which suggests the incidents were isolated.

But, the severity of these particular slurs should not be understated. "Porch monkey" is a racially inflammatory term. And, the term "nigger-rigged," particularly when considered cumulatively with other verbal and nonverbal conduct in this workplace, evidences not only racial enmity, but a racially motivated hostility towards blacks in supervisory or management positions, such as Plaintiff and Donaldson. This other verbal and non-verbal conduct, addressed more specifically below, included circumventing and tolerating the circumvention of black supervisors, and treating Plaintiff in a demeaning, condescending manner.

Plaintiff also complains of the slide presentation by Edie Snethen, the head of the Public Works Department. Snethen's use of a picture of a black slave tied to a post and being whipped, to illustrate what the budget process feels like, is subjectively offensive. And, given that Snethen and others had just attended a meeting on discouraging racially disparaging comments, Snethen's use of this illustration surely was objectively offensive to those having discussed the importance of a workplace free of racially offensive language.

Plaintiff further complains of multiple incidents of verbal and non-verbal conduct by Mike McGee, then the deputy director of public works, a management position above both Plaintiff and Donaldson. Although McGee did not utter any racial slurs or jokes, that does not end the Court's inquiry into the totality of the circumstances. Non-verbal conduct may be considered; and, conduct that is not overtly racist may be considered. McGee ripped papers out of Plaintiff's hands and allowed others to circumvent Plaintiff's supervisory authority, conduct that suggests disrespect and condescension. Ken Donaldson, the only other black supervisor, characterized McGee's behavior as "hateful." Viewing this evidence in the light most favorable to Plaintiff, and drawing inferences therefrom, when viewed along with McGee's comment that Plaintiff was a "pipeline to the community" and "needed to be shut down," McGee's conduct evidences racial animus, and in particular hostility towards Plaintiff's supervisory role. As the Tenth Circuit keenly observed in *McCowan v. All Star Maintenance, Inc.,*[27]

... because conduct which is not [race]-based may form a part of the context or

---

24. *Penry,* 155 F.3d at 1261.

25. *Id.* at 1262 (citation omitted).

26. *Nieto,* 268 F.3d at 1219 n. 7 (citations omitted).

27. 273 F.3d 917, 925 (10th Cir.2001) (citations omitted).

environment in which the discriminatory conduct is alleged to have occurred, such conduct may be relevant to, and should be considered in, evaluating a hostile work environment claim ... even if a comment about Plaintiffs' baggy pants or low riders might not be explicitly racial, given the context of the statement, it could be reasonably inferred the remarks were related to Plaintiffs' race and were part of an ongoing, pervasive environment of racial taunting.[28]

Donaldson, the only other black supervisor, gave an exit interview in which he described the work environment as one where "[m]inorities have been the victims of racist action from slurs to effigies." Donaldson also stated that white employees circumvented his authority and that despite his complaints, they were allowed to continue to circumvent his authority. Although Donaldson's exit interview describes hostility and abuse similar to that described by Plaintiff, Donaldson does not specify when, or over what time period(s), any of this conduct occurred. The record evidences that Donaldson came to work after Plaintiff did; and that Donaldson was Plaintiff's immediate supervisor at the time of the Snethen incident, as well as during all or part of the time that McGee engaged in offensive verbal and nonverbal conduct. However, because Donaldson's exit interview is in May 2001, and because neither Donaldson nor Plaintiff specify when much of the offensive conduct occurred, it is difficult for the Court to evaluate the frequency or pervasiveness of the conduct.

Nevertheless, considering the totality of the circumstances, the Court concludes that a rational jury could find that this workplace was permeated with racially discriminatory verbal and nonverbal behavior. Although conduct may be actionable without causing a tangible psychological injury, Plaintiff stated that these incidents resulted in him being treated for depression and prescribed anti-depressant medications, for the first time in his life. Moreover, Plaintiff stated that his supervisory authority was circumvented and allowed to be circumvented. Plaintiff thus alleges that the conduct altered his ability to perform at work. Thus, the Court concludes that a rational jury could find that the discriminatory conduct was sufficiently severe or pervasive enough to alter the conditions of Plaintiff's employment and create an abusive working environment.

### *Employer Liability*

 To hold Defendant liable for a racially hostile work environment, Plaintiff must show one of three bases for employer liability.[29] Plaintiff must show that Defendant was negligent, by failing to take reasonable action to remedy a hostile work environment it knew or should have known about. Alternatively, under the "actual authority theory" of liability, Plaintiff must show that the perpetrator harassed another employee within the scope of his or her employment. Or, Plaintiff may demonstrate liability under the "apparent authority theory," under which the harassing employee acts with apparent authority from the employer. Plaintiff must show: (1) the conduct occurred within the transgressor's scope of employment; (2) the employer knew, or should have known, about the violation and failed to respond in a reasonable manner; or (3) the transgressor acted with apparent authority or was aided by the agency relation.[30]

---

28. *Id.*

29. *Hollins v. Delta Airlines,* 238 F.3d 1255, 1258 (10th Cir.2001) (citations omitted).

30. *Ford v. West,* 222 F.3d 767, 775–76 (10th Cir.2000) (citations omitted).

■ Because there is no allegation that Yocum and Fisher, two non-supervisory employees, harassed their co-worker Haggerty while acting with actual or apparent authority, Defendant can be held liable for their conduct only under the negligence theory. Thus, Plaintiff must prove that Defendant knew or should have known of the harassment by Yocum and Fisher and "failed to take prompt and effective remedial measures."[31] There is no evidence that anyone complained about Yocum or Fisher's conduct, or that Defendant should have been on notice, until Haggerty complained to Plaintiff. Once Haggerty complained to Plaintiff, Defendant took swift remedial action. Yocum was terminated. And Plaintiff, acting in his capacity as supervisor for Defendant, suspended Fisher. This action proved effective, for Plaintiff acknowledged that thereafter he had no other complaints about Fisher using racially derogatory terms. Thus, with respect to Yocum or Fisher's contribution to the hostile working environment, Plaintiff cannot establish that Defendant would be liable.

■ Plaintiff also contends that the hostile work environment was created by the conduct of Snethen (and her successor Jeff White) and McGee, the director and deputy director of public works, managers with authority over Plaintiff and his immediate supervisor. Plaintiff appears to argue two theories, that Snethen and McGee while "acting within the scope of their employment" misused power they had actual authority to exercise; and that the Defendant was negligent with respect to the conduct of Snethen and McGee.[32] In *Burlington Industries, Inc. v. Ellerth,*[33]

the Supreme Court noted that when a supervisory level employee is accused of the harassing conduct, either the negligence or the actual authority theory of employer liability may apply.

In support of the negligence theory, Plaintiff contends that Defendant knew or should have known of the conduct of McGee, Snethen and Jeff White, because their actions "were continuous, were not isolated, were humiliating to the plaintiff, caused him severe emotional distress and affected his job performance." Yet, nothing in the record shows that Plaintiff or anyone else complained of the conduct of Jeff White; and nothing shows that anyone complained about Snethen until Plaintiff complained about her slide presentation. Nor is there any evidence that the conduct of White or Snethen was so frequent or pervasive, that Defendant should have known. Plaintiff alleges that White attempted to deny him vacation leave; but the record does not show that Plaintiff brought this to the attention of any management level employee of Defendant. There are no other allegations that White harassed Plaintiff in any way.

Other than Plaintiff's general statement that he perceived that Snethen excluded blacks from management positions, nothing in the record demonstrates abusive conduct by her. In fact, Plaintiff admits that prior to the slide presentation, Snethen had never acted in a racially offensive way. Plaintiff thus never reported or complained of Snethen's behavior, until he complained to the Mayor about Snethen's slide presentation. And, Defendant's response was swift and effectively remedial.

**31.** *Freeman v. Kansas,* 128 F.Supp.2d 1311, 1322 (D.Kan.2001) (citing *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 577 (10th Cir.1990)).

**32.** *See* Memorandum in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 37), p. 10–11.

**33.** 524 U.S. 742, 758–759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Snethen was terminated, Plaintiff stated, before he even signed a complaint about the incident.

■ The analysis of Defendant's liability for negligence in responding to McGee's behavior is more complicated. Both Plaintiff and Donaldson, supervisors themselves, but lower ranking than McGee, experienced behavior from McGee that they found objectionable. Plaintiff described verbal and non-verbal conduct which Plaintiff subjectively perceived as creating a racially hostile work environment. Plaintiff complains that McGee, while not engaging in racial slurs or jokes, engaged in other verbal and nonverbal conduct that was racially offensive, such as tearing paperwork out of Plaintiff's hand, allowing others to circumvent Plaintiff's supervisory authority, and investigating or inquiring into how Plaintiff's church was built. This Court has analyzed the conduct and has concluded that a rational jury could find, both subjectively and objectively, that McGee's conduct directed toward Plaintiff created or contributed to a hostile work environment.

There is no evidence, however, that Plaintiff complained to anyone, or otherwise brought McGee's conduct to the attention of Defendant's management level employees. Although the only other black supervisor, Ken Donaldson, was Plaintiff's immediate supervisor, the record does not show that Plaintiff complained to Donaldson about McGee's conduct. Rather, Plaintiff intimated that Donaldson had to be aware of McGee's harassment of Plaintiff, because of the racially offensive statement that McGee made to Donaldson about Plaintiff. McGee allegedly told Donaldson that Plaintiff was a pipeline to the community who needed to be shut down. Plaintiff also stated that McGee had, for racially motivated reasons, denied promotion to a black female employee whose

promotion had been approved by Donaldson, and changed the job qualifications to exclude the applicant from the promotion. But, Donaldson did not specifically mention either of these incidents in his exit interview. Donaldson was apparently not deposed, and other than his somewhat cryptic statements in an exit interview dated May 11, 2001, the record includes no statement or testimony from Donaldson.

Plaintiff's assertions are essentially hearsay; he is relating the substance of a conversation between Donaldson and McGee; and he is relating another incident involving Donaldson and McGee but not involving Plaintiff. Yet Ken Donaldson, the person who would have direct knowledge of these incidents, if they occurred, does not mention either incident.

Even if McGee made the disparaging remark about Plaintiff to Donaldson, the Court cannot conclude that McGee related the remark in a way that Donaldson understood to be racially offensive. Absent any evidence about this conversation between McGee and Donaldson, other than Plaintiff's conclusory statement, the Court cannot conclude that Defendant had or should have had notice of McGee's offensive conduct.

In his exit interview, Donaldson confirms, in an unspecific way, Plaintiff's statement that McGee circumvented Donaldson's supervisory authority. But Donaldson's interview did not mention McGee circumventing, for racially motivated reasons, Donaldson's authority to promote an employee. Thus, the Court is left with Plaintiff's conclusory, unsupported statement of the motivation or reason underlying McGee's circumvention of Donaldson's authority.

To be sure, in his exit interview, Donaldson referenced McGee's conduct, characterizing it as "hateful." Donaldson noted

that there were "numerous complaints" made about McGee, but McGee's ". . . bad behavior was emboldened and continued because an official investigation was never conducted; and when McGee was given the responsibility to 'investigate himself,' '[h]e immediately came after the employees.' " But, Donaldson did not state that the complaints, the investigation, or the so called retaliation by McGee, were based on McGee's expressions of racial animus.

Although Donaldson's exit interview complains of an environment where minorities are subjected to racist slurs and conduct, his exit interview also described an environment that is unpleasant for reasons unrelated to race. For example, Donaldson complained of "micro management." He called the workplace an "uncivil" area of "dysfunction," where "morale is low because of the current leadership." Donaldson went on to say:

> [T]here are bitter feeling between some division managers that are so bad that I don't feel the Public Works management team will ever be a cohesive unit unless this is addressed. There are people on the management team that really hate each other. The proof of dysfunction within the Public works in (sic) evident in the fact that the last two Directors left with major detractors in the Department.

Donaldson also noted that there are conflicts among a number of people in the workplace. He stated that both he and his predecessor (who was not black, according to Plaintiff's historical account of the department) were "incompatible" with McGee.

Donaldson's exit interview failed to show that Defendant was negligent with respect to McGee's conduct. Despite his description of a racially offensive environment, Donaldson never stated that McGee's "bad behavior" was racially offensive or racially motivated such that Defendant knew or should have known that remedial action was necessary. Donaldson didn't identify who it was that subjected minorities to racial slurs and effigies. And, Donaldson didn't describe the nature of McGee's conduct, other than calling it bad and hateful.

Moreover, reliance on Donaldson's cryptic exit interview is deficient for another reason. Donaldson never identified during what time period(s) minorities were being subjected to racial slurs and conduct. Nor did he identify the time period(s) in which complaints were made about McGee's conduct, irrespective of whether McGee's conduct was racially offensive or generically offensive. Donaldson's exit interview is dated May 11, 2001, some two years after the racially offensive incidents Plaintiff complains about. Thus, Donaldson's interview does not establish that Defendant was negligent with respect to McGee's conduct, or anyone else's conduct.

■ Plaintiff also alleges that Defendant should be held liable for the conduct of its employees "acting within the scope of their employment." [34] As a general rule, harassment by a supervisor is not conduct within the scope of employment.[35] However, liability may be imposed where the employee's "purpose, however misguided, is wholly or in part to further the master's business." [36] Plaintiff has not argued nor offered evidence to suggest that

**34.** *See* Memorandum in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 37), p. 10.

**35.** *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 757, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

**36.** *Id.* at 756, 118 S.Ct. 2257.

the employees' purpose was wholly or in part to further the master's business.

The "scope of employment" theory is not the only basis for employer liability.[37] Another potential theory of liability is the "apparent authority" or "aided by the agency relation" theory. This theory applies to Snethen, White and McGee, because all were supervisors with immediate or higher level authority over Plaintiff. In its *Faragher*[38] and *Burlington*[39] decisions announced on June 26, 1998, the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." But, when no tangible employment action, such as termination, demotion or undesirable reassignment, is taken against the victimized employee, the employer has an affirmative defense.[40] The employer must prove by a preponderance of evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing[41] behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[42]

Plaintiff alleges no adverse employment action. He was neither fired, demoted nor subjected to some other undesirable denial or change of benefits. Thus, Defendant has the affirmative defense available to it. And, the preponderance of evidence demonstrates that Defendant has no liability by virtue of the affirmative defense. Plaintiff failed to take advantage of preventive or corrective opportunities when he failed to complain to anyone about the conduct of McGee or Jeff White, Snethen's successor. The fact that McGee was the deputy director of public works and White was the director, both several levels higher in management than Plaintiff, did not render his failure to complain reasonable. Plaintiff had no qualms about complaining about Snethen's presentation despite her being the director of public works. Plaintiff took his complaint all the way to the Mayor. This demonstrates that there was an avenue for complaints and that Plaintiff knew how to register a complaint. Moreover, as a supervisor himself, Plaintiff had some authority to address complaints. Plaintiff took prompt corrective action in response to the complaint about Fisher. And, prompt corrective action was taken in response to the complaint about Yocum. In short, Defendant has borne its burden of proof on the affirmative defense, by showing that with respect to some complaints, Plaintiff took no opportunity to seek corrective action; but for those incidents that Plaintiff took reasonable action, Defendant responded promptly and appropriately to prevent and correct the harassing behavior. Plaintiff has failed his burden of presenting evidence establishing a genuine issue of fact that the employer's response was unreasonable.[43]

---

**37.** *Id.* at 758, 118 S.Ct. 2257.

**38.** *Faragher v. City of Boca Raton,* 524 U.S. 775, 807–808, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998).

**39.** *Burlington,* 524 U.S. at 742, 118 S.Ct. 2257.

**40.** *Faragher,* 524 U.S. 775, 118 S.Ct. at 2293.

**41.** *See Ford v. West,* 222 F.3d 767, 776 n. 8 (10th Cir.2000) (noting that employer liability standards are equivalent for race and sex-based discrimination) (citations omitted).

**42.** *Faragher,* 524 U.S. 775, 118 S.Ct. at 2293.

**43.** *Ford v. West,* 222 F.3d 767, 776 (10th Cir.2000) (citing *Wilson v. Tulsa Junior College,* 164 F.3d 534, 541 n. 4 (10th Cir.1998)).

### Tort of Outrage

 Plaintiff also claims intentional infliction of emotional distress or outrageous conduct. Under Kansas law, intentional infliction of emotional distress is the same as the tort of outrage.[44] The elements of the tort of outrage are:

(1) conduct of defendant must be intentional or in reckless disregard of the plaintiff, (2) conduct must be extreme and outrageous, (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress, and (4) plaintiff's mental distress must be extreme and severe.[45]

 Plaintiff must make a threshold showing that: the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and that plaintiff has suffered such extreme emotional distress, that no reasonable person would be expected to endure it.[46]

 The standard for this tort of outrageous conduct is strict. It must be conduct that is so outrageous "... as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society"; and "... mere insults, indignities, threats, annoyances, petty expressions, or other trivialities" are insufficient.[47] As this Court noted in *Land*

*v. Midwest Office Technology, Inc.,*[48] even conduct sufficient to support a Title VII hostile work environment claim is found insufficient for a claim of outrageous conduct, absent repeated physical threats coupled with racially or sexually abusive language, like those found in the *Gomez* case.[49] Plaintiff was not subjected to any physical threats and thus the complained of conduct does not meet the definition of outrageous conduct under Kansas law.

Moreover, as the Tenth Circuit noted in the *Bolden* case, Kansas courts have been reluctant to hold employers liable for outrageous conduct of employees, particularly in the context of claims of workplace harassment or discrimination.[50] One notable exception is the *Gomez* case. But in *Gomez,* the perpetrator was the employer, not a co-worker of the victim.[51] Thus, in *Gomez,* the Kansas court found the employer directly liable; *Gomez* did not extend liability to employers for outrageous conduct through the application of vicarious liability.

### III. CONCLUSION

Although Plaintiff has made out a prima facie case of hostile work environment, he has failed to show the extreme conduct made actionable by the tort of outrage. And, despite making out a prima facie case

---

**44.** *See Smith v. Welch,* 265 Kan. 868, 967 P.2d 727 (1998).

**45.** *Bolden v. PRC Inc.,* 43 F.3d 545, 553–554 (10th Cir.1994), *cert. denied* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995) (citing *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986)); *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman,* 267 Kan. 245, 257, 978 P.2d 922, 930 (1999).

**46.** *Bolden,* 43 F.3d at 554 (citation omitted).

**47.** *Roberts v. Saylor,* 230 Kan. 289, 293, 637 P.2d 1175, 1179 (1981); *see also Lindemuth v. Goodyear Tire & Rubber Co.,* 19 Kan.App.2d 95, 100, 864 P.2d 744, 749 (1993).

**48.** 114 F.Supp.2d 1121, 1144 (D.Kan.2000) (J. Crow) (citations omitted).

**49.** *See Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982) (denying summary judgment where racial slur and threats of violence made over several days, including a 15 minute tirade where employer shook his fist at plaintiff and plaintiff suffered severe emotional distress leading to a two week hospitalization).

**50.** *Bolden,* 43 F.3d at 554.

**51.** *Id.*

of hostile work environment, Plaintiff has failed to prove under the negligence theory that Defendant is liable for the conduct of supervisory or non-supervisory employees. Based on the same evidence, under the actual authority theory, to the extent Defendant is vicariously liable for the conduct of supervisory employees, Defendant has shown it is entitled to an affirmative defense. Plaintiff failed to take reasonable opportunities to seek corrective action with respect to the conduct of some supervisors. And, with respect to the conduct of other supervisors, when Plaintiff took the opportunity to seek corrective action, Defendant responded with prompt, effective corrective action.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 30) is **GRANTED.**

**IT IS FURTHER ORDERED** that this action is **DISMISSED.**

**IT IS SO ORDERED.**